Filed 12/2/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S094890 |
| v. | ) | |
| | ) | |
| JOSEPH KEKOA MANIBUSAN, | ) | |
| | ) | Monterey County |
| Defendant and Appellant. | ) | Super. Ct. No. SM 980798 |
| _____ | ) | |

A jury convicted defendant Joseph Kekoa Manibusan of two counts of first degree murder and one count each of attempted murder, aggravated mayhem, and second degree attempted robbery.  It also found true special circumstance allegations of multiple murder, drive-by murder, and felony murder, and enhancement allegations of discharging a firearm from a vehicle causing great bodily injury or death, personal use of a firearm, and a prior juvenile conviction of assault with a deadly weapon causing great bodily injury.  It returned a verdict of death for the two murder convictions.  After denying the automatic application to modify the verdict (Pen. Code, § 190.4, subd. (e)),[1] the trial court sentenced defendant to death for those murder convictions.  This appeal is automatic. (§ 1239, subd. (b).)  We affirm the judgment.

---

[1]     All further unlabeled statutory references are to the Penal Code.

## I. FACTS

Defendant's convictions arise mostly from events in Monterey County on the night of January 31, 1998, and the morning of February 1, 1998, during which Priya Mathews and Frances Olivo were shot dead and Jennifer Aninger was severely injured by a gunshot to the head.

### A. Guilt Phase Evidence

Only the prosecution introduced evidence during the trial's guilt phase.

#### 1. *The 1998 Shootings*

On January 30, 1998, defendant attended a party in Seaside with Norman Willover and Adam Tegerdal. They used methamphetamine and stayed awake together through the night and into the next day. Sometime in the late afternoon or early evening of January 31, they drove in Tegerdal's 1994 Mercury Cougar to a house in Marina, where Willover retrieved a backpack containing a gun. They also used a small additional amount of methamphetamine. Later that evening, they returned to Seaside and picked up Melissa Contreras near the house of Tim Frymire, where defendant and Contreras were staying. Contreras thought they were going to drink and hang out; she did not know anyone in the car had a gun.

As defendant drove the group to a gas station, he and Willover discussed robbing people. About the time the group arrived at the gas station, Contreras learned of the gun and heard defendant and Willover talk about using it to rob people. At defendant's direction, Contreras took over the car and drove the group around Seaside and Monterey until defendant and Willover, upon spotting a potential robbery victim, told Contreras to park near Jacks Park in Monterey. Defendant and Willover exited the car with the gun in their possession. They returned 10 to 15 minutes later, having found no one to rob.

Contreras drove the group away, but soon turned the driving over to defendant and entered the backseat. Defendant, after discussing with Willover the possibility of finding a victim at Monterey's wharf area, drove the group to Monterey's Municipal Wharf II. There, sometime after 11:00 p.m., defendant, Willover, and Tegerdal spotted Aninger and Mathews. After Tegerdal asked if the women were carrying purses, defendant made a U-turn at the end of the wharf so the group could circle back and observe them. He drove past the women and made another U-turn, putting the women on the passenger side of the car, where Willover, wearing a leather glove on one hand and a bandana over his face, was sitting. Defendant stopped the car five to 10 feet away. Willover stuck his head and hand out of the window and said, "give me your money" or "give me the money." The women did not respond. Willover then turned back into the car, toward its other occupants, and said "something like, these bitches are being assholes. They didn't hear me." He then turned back toward the women, pointed his gun at them, and started firing. He fired numerous times, hitting Mathews in the back, the arm, and twice in the left thigh, and hitting Aninger once in the head and once in the upper arm. Mathews died from her wounds. Aninger survived, but sustained brain damage that resulted in an impaired ability to concentrate, memory loss, a lost sense of smell, and lost motor function in her left hand.

Immediately after the shooting, defendant made a U-turn and sped away. Willover said, "we couldn't leave witnesses," and defendant "just kind of laughed" in response. Willover also "bragg[ed] about how long it [had been] since [he had] done that. He said it was like four years. He hasn't done that in four years, and it felt good and . . . [defendant] needs to try it." Defendant, Willover, and Tegerdal agreed they needed to change cars to avoid being caught. Defendant drove to Tegerdal's house in Salinas, where they exited the Cougar and entered Tegerdal's Chevrolet Monte Carlo. As Tegerdal drove away, Willover acted

3

"happy," "like he was proud of what he" had done.  Defendant also seemed "happy," "like he was proud of" Willover.  They congratulated each other on the shooting, giving each other "props."  Defendant said "he wanted to have his turn."

At some point, defendant took over the driving and headed back to Seaside. He and Willover discussed finding another victim.  Defendant said he wanted "to try to show [Willover] up," because Willover had already shot two people.  In Seaside, defendant and Willover spotted Olivo standing at the corner of Fremont Boulevard and Amador Avenue.  Willover asked defendant if he was going "to do her" or "do it to her" or "shoot her."  Defendant nodded, said "watch this," drove around the block, and maneuvered the car so he was closest to Olivo.  He stopped the car about eight feet away and silently gestured for Olivo to approach.  Olivo approached and looked inside the car.  As she did, defendant put his hand out of the window and began shooting.  Olivo cried, "please don't," but defendant continued shooting, firing eight or nine shots and hitting Olivo three times.  One of the shots passed through her heart.  She died of her injuries.

Defendant drove away, "laughing about" the shooting.  Willover was "laughing with him."  They were "taking it like kind of a game."  Defendant became upset that he had not fired all of the bullets in the gun's clip.  He saw an occupied car parked along the roadside and, stating that he "might as well get rid of the rest of the bullets," fired the remaining bullets into it.

When the parked car's occupants began chasing defendant in their car, defendant drove to the Fort Ord home of family friends Anthony and Linda McGuiness, where his father was living.  There, Willover and Tegerdal removed shell casings from the car.  Awakened by the group's arrival, Anthony McGuiness came out of his bedroom and found the group seated in his living room. Defendant said his car had run out of gas and asked for a ride to a friend's house in Seaside.  Anthony agreed and, following defendant's directions, drove defendant

4

past the scene of the Olivo shooting and on to Tim Frymire's house in Seaside, where defendant was living.

Defendant arrived at Frymire's house about 3:00 a.m. Upon entering, he indicated he wanted to speak with Frymire privately. He seemed "real antsy" and "[k]ept looking out the window." He started saying things Frymire "didn't want to hear," and asked Frymire if he still had the .22-caliber shells defendant had given him some months earlier. Frymire replied, "no," and told defendant that, if he had a gun in his pants, he needed to take it outside. Defendant then briefly left the house. After returning, he continued to look out the windows. Frymire then asked defendant if he would "feel better about putting [the gun] somewhere else," and offered to let defendant put the gun in the trunk of his car and give defendant the key. The two exited the house and defendant put a semi-automatic handgun in the trunk of Frymire's car. A few hours later, defendant left in the car with Frymire's nephew and another man. The latter two later returned in the car to Frymire's house, without defendant or the gun. That night, after returning to Frymire's house, defendant, with "a smile on his face," repeatedly pointed alternatively at his chest and at the television as he watched a television news report about the shootings. A short time later, Frymire contacted Seaside police to report his suspicion that defendant had been involved in the shootings.

On February 4, 1998, Willover asked Joshua Riley to store at his house a dark-colored backpack containing a loaded .22-caliber semiautomatic handgun, some ammunition magazines, and several boxes of bullets. He told Riley the gun was "heated," meaning it had been involved in some kind of trouble. That night, police went to Riley's residence, having learned from interviewing Willover about the gun's possible location. There, they recovered the backpack, a gun, ammunition clips, and some extra ammunition. Ballistics tests showed the gun matched bullets recovered at the scene of the shootings and from the victims'

5

bodies.  It was the same type of gun Frymire had earlier seen defendant place in the trunk of Frymire's car.

That same day, police arrested defendant at Frymire's house.  A few days later, defendant called Frymire from prison and asked Frymire if he was "being true."  Frymire understood defendant to be asking whether he was keeping quiet and not "ratting him off."  Defendant made a similar call to Contreras.

### 2. *The 1997 Robbery Attempt*

On October 14, 1997, defendant and Tegerdal were driving around Monterey talking about their lack of money.  At a shopping center, defendant got Tegerdal to stop the car, exited, ran up to a woman, and tried to take her purse. The woman, though falling to the ground in the struggle, held on to her purse. Defendant gave up, ran back to the car, and drove away with Tegerdal.

### B.  Penalty Phase Evidence

During the penalty phase, the prosecution introduced victim impact evidence from Mathews's sister and from Olivo's husband, two of her four children, and her sister-in-law.  Pursuant to section 190.3, factor (b) (factor (b)), it also introduced evidence of the following prior conduct:  (1) defendant frequently beat up the mother of his son, including in August 1995 when he punched her in the face and left her with two black eyes, a swollen nose, and a bump under her eye; (2) in January 1995, after becoming enraged during an argument with his twin sister, defendant knocked her to the floor and kicked her, causing her to lose consciousness; (3) defendant, concealing a sawed-off .22-caliber rifle in his waistband and .22-caliber ammunition in his pocket, went looking for his sister at the hospital where she was receiving treatment for the injuries he had inflicted; (4) defendant, having been taken by police to a police station and later released, returned to the hospital and told the security guard who had initially pointed him

6

out to police, "snitches don't last;" (5) during a traffic stop in January 1997, police found defendant in the backseat of the stopped car with one round of ammunition in his pocket, and found under the driver's seat in front of him two handguns, one of which used bullets of the same caliber as the bullet found in defendant's pocket; (6) during a traffic stop in July 1997, police arrested defendant on a warrant and found a knife in a sheath near his leg; (7) during a traffic stop in October 1997, police found two knives, one near defendant; (8) in June 1998, when Willover was placed in a holding cell with defendant, defendant ran over to Willover and began hitting him repeatedly, leaving him with a bloody nose and torn clothing; (9) in August 2000, while a jail inmate, defendant participated in a riot, refused to comply with orders to leave his cell, and charged an officer who had used pepper spray to induce compliance, hitting his protective shield and cracking it; and (10) defendant later wrote a letter to a friend bragging about his role in the riot and stating that he liked to "get rowdy" with the prison guards.

Defendant presented testimony from 23 witnesses regarding (1) his history of drug addiction, including his frequent use of methamphetamine, (2) the effects of methamphetamine, and (3) his family history and upbringing, and the effect of that history and upbringing.

In rebuttal, the prosecution called an expert who testified that he had examined various reports and transcripts of witness testimony and had found no evidence defendant was under the influence of drugs when he committed the crimes.

## II. DISCUSSION

### A. Juror No. 58

Defendant alleges numerous errors in the trial court's decision to allow Juror No. 58 to remain on the jury despite her alleged fear for her safety. For reasons set forth below, his claims fail.

#### 1. Background

On October 2, 2000, when the jury returned for its second day of guilt phase deliberations, the jury foreperson, Juror No. 58, gave the court a letter, stating: "[I]t has been brought to my attention that my anonymity as a juror for [this case] has been compromised. [¶] On Thursday, September 28th, a person whom I know personally walked into the courtroom to observe the trial. As you may expect, this came as a shock to me. However, I dismissed the incident as a coincidence. However, this weekend I became aware of this person as a close friend of both the defendant and his family. Additionally, I became aware of the fact that my name has already been revealed to the members of his family. [¶] As you may understand, this does not make me feel comfortable to continue as a juror in this case. My safety and the safety of my family may be in jeopardy because of this incident. Please accept my request to step down as a juror on this case."

Upon the court's inquiry out of the other jurors' presence, Juror No. 58 first explained that (1) the person to whom her letter referred — Christy Page — was a friend of a friend named Jessica, (2) during conversations with Jessica over the weekend, Juror No. 58 learned that Page was a good friend of defendant's mother, recognized Juror No. 58 when she came to court, and talked about Juror No. 58 with a member of defendant's family, and (3) upon learning this information, Juror No. 58's husband expressed concern about their family's safety and urged Juror No. 58 to ask the court to excuse her from the jury. Juror No. 58 then added that

8

the information regarding Page would not affect her verdict or impact her ability to be impartial or to consider the evidence objectively, and that she did not want the court to excuse her from the jury; that she was not concerned about the possibility of retribution for her jury service, and became less concerned the more she thought about it; that she had given the letter to the court just so it would be aware of the situation; and that she had not discussed the details of the case with anyone or received any information from Jessica about defendant or his family.

Based on these events, defendant asked the court to replace Juror No. 58 with an alternate, arguing that the information raised substantial doubt as to her ability to be fair. The trial court denied the request, citing Juror No. 58's answers and demeanor and finding "no demonstrable reality that she [was] unable to perform her duties as a juror."

Late that afternoon, the court received a note from the jury signed by Juror No. 58 stating: "Can we switch from the original foreperson to the co foreperson for purposes of reading (and signing) the verdict(s)." The court replied that the jury had discretion to change the foreperson during deliberations. Defendant then moved for a mistrial, arguing that the request was evidence Juror No. 58, despite her earlier assurance, was afraid to serve on the jury and had disclosed her concern to other jurors. The trial court denied the motion, finding defendant's arguments to be unsupported speculation and commenting that requests for changes in jury forepersons "come up all the time."

The jury returned its verdict shortly thereafter. Defendant then asked the court to remove Juror No. 58 from the penalty phase jury. The trial court denied the motion, noting the absence of any new supporting information. After the penalty phase, it also denied defendant's motion for new trial, which he based in part on Juror No. 58's participation in deliberations.

9

## 2. *Discussion*

Defendant first asserts the trial court failed adequately to investigate the possibility of juror bias, incompetence, or misconduct. He concedes the court "proceeded properly at first" in conducting a hearing upon receiving the letter from Juror No. 58. However, it erred, he argues, in failing to conduct a second inquiry upon receiving the jury's subsequent request to "switch from the original foreperson to the co foreperson for purposes of reading (and signing) the verdict(s)." This request, he contends, "was an overt demonstration that," despite Juror No. 58's earlier assurances, "the fear of reprisal that she had [earlier] articulated . . . was still active in her thought process and affecting her actions as a juror." By creating a reason to doubt her impartiality, the request "reinvigorated" the court's duty to investigate possible misconduct.

Defendant's claim fails. As we have explained, "not every incident involving a juror's conduct requires or warrants further investigation." (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.) "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct — like the ultimate decision to retain or discharge a juror — rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. [¶] . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 343.) Here, the note from the jury did not provide the court with any information that, if proven to be true, would constitute good cause to doubt Juror No. 58's ability to perform her duties. It did not disclose, or even hint at, the reason for the request to change forepersons. Moreover, even were the note adequate to support an inference that Juror No. 58,

10

because of safety concerns, did not want to sign and announce the verdict *as foreperson*, that inference did not give the court reason to doubt her unequivocal assurances to the court earlier that day that the information regarding Page would not affect her verdict or impact her ability *as a juror* to be impartial or to consider the evidence objectively. As we have explained, deliberating jurors "may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny. The very act of questioning deliberating jurors about the content of their deliberations could affect those deliberations." (*Cleveland*, *supra*, 25 Cal.4th at p. 476.) Therefore, to ensure the sanctity and secrecy of the deliberative process, a trial court's inquiry into grounds for discharging a deliberating juror should be as limited as possible, and should cease once the court is satisfied that the juror in question "is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*Id.* at p. 485.) Given these principles and Juror No. 58's assurances, the trial court did not abuse its discretion in failing to conduct a second inquiry upon receiving a request from the jury to change foreperson.

Nor did the court abuse its discretion in failing to conduct further inquiry when, after return of the verdicts, defendant requested Juror No. 58's removal from the penalty phase jury. As defendant concedes, the only new information he offered as a basis for this request was the fact that the jury had returned its verdicts only about 15 minutes after receiving the court's response about switching forepersons. That information added nothing to the question of Juror No. 58's ability to perform her duties. Accordingly, the court did not abuse its discretion in declining to inquire further into the matter.

As for the denial of his new trial motion, defendant relies on three sworn declarations he filed with the motion. In one, a defense investigator stated that

11

Juror No. 58 said that, while she was at a youth soccer game sometime in October 2000 — she could not recall whether trial was in progress at the time — her husband told another parent she was a juror in the case, and the other parent, who was a deputy sheriff, replied that he knew defendant. In a second, another juror in the case stated that, on the day of the verdicts, Juror No. 58 "told [the other jurors] that she did not want to read the verdict because she knew someone who had a connection with the Manibusan family and she feared for her safety." The declarant juror understood this statement to mean that Juror No. 58 "feared that she might be in danger later on if she read the verdict." In the third declaration, Christy Page stated (1) two to four weeks after appearing in court, she had a conversation with Jessica, who was Juror No. 58's best friend, (2) during that conversation, Jessica told Page about a conversation Juror No. 58 said she had had with a deputy sheriff at a youth baseball game, (3) Juror No. 58 told Jessica that, at the game, the deputy sheriff told Juror No. 58 that, during a conversation with defendant, defendant said "he had killed that woman," he "would do it again" if "he was out of jail," and he "had no remorse and did not care" and "would not change a thing." Defendant also relies on the unsworn statement his counsel made in the new trial motion that, sometime after trial, Juror No. 58 "spoke[] to" a defense investigator and "told" him "that during deliberations on the morning of the day that the guilty verdicts were rendered she told the other jurors that she did not want to sign the verdict and she probably mentioned that she was concerned for her personal safety."

In the trial court, defendant's counsel explained he was arguing, not that the declarations warranted granting a new trial, but only that they were sufficient to compel the court to conduct further inquiry. Similarly, on appeal, defendant does not argue the declarations necessarily warranted Juror No. 58's dismissal. Rather, he argues that, in light of the new information the declarations presented, the trial

12

court erred in failing to conduct further inquiry. In his view, "[w]ith the new facts showing that Juror No. 58 did inform the jury that she was afraid of retaliation and why, and also that she discussed the case outside the jury room, with her husband and friend, and possibly even with a sheriff's deputy, the totality of the circumstances showed that the possibility of misconduct was based on more than mere speculation and thus demanded further investigation."

Defendant's argument fails. The declarations of Page and the defense investigator, and the statements of counsel in the motion, contain hearsay. Hearsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an evidentiary hearing. (*People v. Dykes* (2009) 46 Cal.4th 731, 810; *People v. Avila* (2006) 38 Cal.4th 491, 605; *People v. Carter* (2003) 30 Cal.4th 1166, 1216-1217; *People v. Hayes* (1999) 21 Cal.4th 1211, 1256; *People v. Cox* (1991) 53 Cal.3d 618, 696-700 (*Cox*).) Defendant offers no persuasive basis for deviating from this general rule. Counsel's statements are insufficient for the additional reason that they are unsworn. (*People v. Dykes*, *supra*, 46 Cal.4th at pp. 810-811.) The juror's declaration, though admissible to the extent it references overt acts — i.e., statements, conduct, conditions, or events that are open to sight, hearing, and the other senses — is inadmissible to the extent it indicates what the juror "understood" Juror No. 58's statement during deliberations to mean. (Evid. Code, § 1150; *People v. Steele* (2002) 27 Cal.4th 1230, 1261 [jurors' statements about "their understanding of the meaning of a life sentence" inadmissible]; *id*. at p. 1266.)

Insofar as the juror's declaration purports to recount what Juror No. 58 "told" the other jurors about not wanting to read the verdict, it fails to establish error. A court must hold an evidentiary hearing on alleged jury misconduct only

13

when the defendant shows "a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the party's evidence presents a material conflict that can only be resolved at such a hearing." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419 (*Hedgecock*).) These restrictions are necessary because allowing routine postverdict juror examinations " 'would open the door to harassment of jurors and . . . ultimately damage the jury process and the administration of justice.' [Citation.] . . . [O]nce aware that after sitting through a lengthy trial he himself may be placed on trial, only the most courageous prospective juror will not seek excuse from service.' [Citation.]" (*Cox*, *supra*, 53 Cal.3d at p. 699.) Moreover, "[t]o the extent jurors might seek to guard against intrusive posttrial inquiry by counsel or the court, thorough and penetrating discussion of the merits of the case might suffer." (*Id*. at p. 700.) Given these principles and Juror No. 58's assurances to the court during deliberations that the information regarding Page would not affect her verdict or impact her ability *as a juror* to be impartial or to consider the evidence objectively, the trial court did not err in finding the information about Juror No. 58's reluctance to read the verdict *as foreperson* insufficient to warrant further inquiry. Indeed, in his new trial motion, defendant did not even cite Juror No. 58's declaration in support of his argument regarding Juror No. 58. On this issue, the motion cited only his counsel's unsworn statements about the posttrial conversation the defense investigator purportedly had with Juror No. 58. It cited the juror's declaration only in support of other, unrelated arguments. Accordingly, defendant has not established that the trial court abused its discretion in declining to inquire further regarding Juror No. 58's ability to serve.

Finally, defendant's claim fails because the premise underlying it — that a juror's fear of a defendant establishes bias or other grounds for discharge — is

14

faulty. In *People v. Navarette* (2003) 30 Cal.4th 458, 500, we held that the trial court had not abused its discretion in declining to discharge a juror who had expressed fear of the defendant, explaining: "Defendant assumes that, because the juror had concerns about his family's safety and the safety of his property, he was therefore biased against defendant, requiring his removal. The record belies this assumption. The court specifically asked the jurors to report if they could no longer be fair and unbiased, and [the juror in question] did not pursue the matter further . . . ." Again, given Juror No. 58's earlier verbal assurances to the court about her ability *as a juror* to deliberate impartially notwithstanding any fear of serving on the jury, the trial court did not abuse its discretion in concluding that the declarations did not warrant further inquiry into the issue. (See also *People v. Brown* (2003) 31 Cal.4th 518, 581-582 [trial court did not abuse its discretion in declining to conduct evidentiary hearing, notwithstanding declarations stating that "[a]ll 12 jurors expressed concern that defendant's gang would retaliate against them as a result of the verdict" and that one juror thought he might "have been followed by a gang member or a member of defendant's family"].)

## B. Jurors' Consideration of Prison Conditions

Defendant asserts the trial court should have granted a new penalty phase trial in light of evidence that, during the penalty phase, the jurors improperly solicited and received information regarding prison conditions. He relies on the sworn declarations of a defense investigator and Juror A.G. In the latter, Juror A.G. stated that (1) Juror R.M. worked at a prison and provided "a lot of information about what life in prison was like for inmates," (2) this information "showed me that while life in prison isn't much of a life, it is still a life," and (3) this information was "[o]ne of the most compelling arguments that may have convinced the jury to vote for death." In the former, a defense investigator

15

reported the following about his posttrial conversations with jurors: (1) Jurors D.S. and No. 58 said that Juror R.M. was asked questions about prison life when it became known he worked in state prison; (2) according to Juror No. 58, Juror R.M. said that prison was hard for some inmates, but not for others, and that inmates received cable television. Defendant asserts that the jury's consideration of this information during deliberations "constituted grave misconduct" because, pursuant to the trial court's order, the parties presented at trial no evidence of conditions in prison.

Defendant's argument fails. The information on this subject in the defense investigator's declarations was hearsay, which, as earlier explained, ordinarily is insufficient to establish an abuse of discretion in denying a motion for new trial that is based on alleged jury misconduct. (*People v. Dykes*, *supra*, 46 Cal.4th at p. 810.) Again, defendant offers no persuasive basis for deviating from this general rule. Regarding Juror A.G.'s declaration, it was inadmissible — and thus insufficient to establish an abuse of discretion — insofar as it purported to state, or speculate on, the effect of the information on his own and other jurors' subjective reasoning processes. (Evid. Code, § 1150; *People v. Steele*, *supra*, 27 Cal.4th at pp. 1261, 1266 [statements about the effect on deliberations of certain jurors' comments are inadmissible].) Thus, the trial court could not consider the statement that the information showed Juror A.G. "that while life in prison isn't much of a life, it is still a life," and was "[o]ne of the most compelling arguments that may have convinced the jury to vote for death."

All, then, that is left to support defendant's argument is Juror A.G.'s statement that Juror R.M. provided "a lot of information about what life in prison was like for inmates." In *People v. Pride* (1992) 3 Cal.4th 195, we rejected a similar jury misconduct claim where a juror known by other jurors to be a prison cook "volunteered that prisoners sentenced to death are 'watched' 23 hours a day

16

and 'allowed to exercise' only 1 hour a day, whereas life prisoners are housed in a 'mainline setting' and have a 'far greater opportunity to escape.' " (*Id*. at p. 267.) We explained: "[L]ay jurors are expected to bring their individual backgrounds and experiences to bear on the deliberative process. 'That they do so is one of the strengths of the jury system. It is also one of its weaknesses . . . . Such a weakness, however, must be tolerated.' [Citations.] Otherwise, few verdicts would stand. [¶] These principles were not offended here. The average juror undoubtedly worries that a dangerous inmate might escape. While [the juror's] statements elaborating on this theme were purportedly based on his experience inside the prison system, he only said what any citizen might assume was true — that inmates sentenced to death are subjected to the tightest form of security and that they have fewer opportunities to escape than other inmates. No misconduct or presumption of prejudice appears." (*Id*. at p. 268.) Similarly, the average juror undoubtedly wonders what life in prison is like for inmates. To the extent Juror R.M. provided information about this subject based on his own experience inside the prison system, nothing suggests he provided information that any citizen might not either assume to be true or already know from the many available sources of information about life in prison, including television, the internet, and other media. No misconduct or presumption of prejudice appears. (See *In re Boyette* (2013) 56 Cal.4th 866, 893 [had jurors told other jurors what they had learned about prison life from watching movie, "no issue of misconduct or prejudice would have arisen"]; *People v. Yeoman* (2003) 31 Cal.4th 93, 162 [" '[j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room' " and, given "common knowledge among laypersons" about the effect of drugs, jurors recounting their personal experiences involving drugs did not commit misconduct].)

17

Nor, contrary to defendant's assertion, did the trial court abuse its discretion in not holding an evidentiary hearing on the alleged misconduct of Juror R.M. As we have explained, an evidentiary hearing on alleged jury misconduct "should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." (*Hedgecock, supra,* 51 Cal.3d at p. 419.) For reasons detailed above, defendant failed to make this showing. Moreover, even had he done so, because the evidence did not "present[] a material conflict that [could] only be resolved at [an evidentiary] hearing," the trial court's decision not to hold such a hearing would not have been an abuse of discretion. (*Ibid.*; see also *People v. Jones* (1997) 15 Cal.4th 119, 195 [even had the defendant made adequate showing of misconduct, "an evidentiary hearing would not have been necessary, because the offer of proof did not present 'a material conflict that [could] only be resolved at such a hearing' "]; *People v. Hardy* (1992) 2 Cal.4th 86, 174 ["Because no material factual dispute was presented to the trial court, it did not abuse its discretion in declining to hold a hearing . . . ."].)

## C. Jurors' Discussion of Defendant's Failure to Testify

Defendant next asserts the trial court should have granted a new trial, or at least conducted further inquiry into possible misconduct, in light of evidence the jurors discussed during deliberations his failure to testify at trial. He relies on Juror A.G.'s sworn declaration, which stated in relevant part: (1) "The fact that the defendant did not testify came up during deliberations"; and (2) "It was the general consensus of the jury that if the defendant testified he would subject himself to damage by the prosecutor's questions." He also relies on a defense investigator's sworn declaration, which stated in relevant part: (1) Juror No. 58

18

"told [the investigator] that jurors talked about the fact the defendant did not testify"; and (2) Juror D.S. "stated that jurors discussed the fact that defendant . . . did not testify." According to defendant, the jurors' discussion of this circumstance violated several of his constitutional rights.

Defendant's argument is unpersuasive. The defense investigator's declaration is hearsay, which, as earlier explained, ordinarily is insufficient to establish an abuse of discretion in denying a motion for new trial or conducting an evidentiary hearing based on alleged jury misconduct. (*People v. Dykes*, *supra*, 46 Cal.4th at p. 810.) Again, defendant offers no persuasive basis for deviating from this general rule. Juror A.G.'s declaration, insofar as it indicates that defendant's failure to testify played a role in the jury's deliberations, is entitled to no consideration, because declarations regarding alleged misconduct may not refer to jurors' subjective reasoning processes. (Evid. Code, § 1150; *People v. Allen* (2011) 53 Cal.4th 60, 75; *In re Stankewitz* (1985) 40 Cal.3d 391, 398.) The juror's ambiguous and nonparticularized statement about the "general consensus of the jury" appears to fall in this category. It does not relate a specific comment that any particular juror made or offer direct quotes or statements of a factual nature, but appears to be Juror A.G.'s subjective characterization of and opinion about what he heard. (See *Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1214 ["The absence of any supporting detail about the jurors having supposedly 'agreed' to do something contrary to an instruction supports the reasonable inference that the affidavits were mere conclusions about the jurors' mental processes."].) Insofar as the declaration indicates the jurors discussed defendant's failure to testify, it is admissible to establish misconduct that raises a presumption of prejudice. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1424-1425.) However, an independent review of the record shows no substantial likelihood the misconduct caused actual harm. As we have previously noted, "[i]t is natural for

19

jurors to wonder about a defendant's absence from the witness stand. [Citation.]" (*People v. Loker* (2008) 44 Cal.4th 691, 749; see also *People v. Deshannon* (1970) 11 Cal.App.3d 982, 988 ["Every lawyer, indeed anyone with common sense, knows that . . . individual jurors do wonder why a presumably innocent defendant does not testify."].) " 'Transitory comments of wonderment and curiosity' about a defendant's failure to testify, although technically misconduct, 'are normally innocuous . . . .' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 727.) The statement that defendant's failure to testify "came up" suggests that any comments about this subject were merely brief and passing observations, and the record offers no basis for concluding otherwise. Moreover, because defendant showed neither "a strong possibility" that prejudicial misconduct occurred nor "a material conflict" that could only be resolved at a hearing, the trial court did not abuse its discretion in declining to hold an evidentiary hearing on this issue. (*Hedgecock*, *supra*, 51 Cal.3d at p. 419.)

### D. Removal for Cause of Prospective Jurors

Defendant next asserts the trial court erred in excusing for cause Prospective Jurors Nos. 24, 199, and 232, based on their views about the death penalty. For reasons explained below, his claim fails.

A trial court may excuse a prospective juror for cause if no reasonable possibility exists the prospective juror could consider imposing the death penalty. (*People v. Schmeck* (2005) 37 Cal.4th 240, 262.) The trial court has broad discretion in making this determination. (*People v. Moon* (2005) 37 Cal.4th 1, 14.) On appeal, we will uphold the trial court's ruling if the record "fairly support[s]" it, "accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made

20

statements that are conflicting or ambiguous. [Citations.]"[2] (*People v. Mayfield* (1997) 14 Cal.4th 668, 727.) Prospective jurors often cannot give unmistakably clear answers as to their ability to impose the death penalty, and the trial court, aided by its assessment of demeanor, is in the best position to assess state of mind. (*People v. Jones* (2102) 54 Cal.4th 1, 41.)

Under these principles, defendant fails to show error. In response to questions from the court, from the prosecution, and from defendant's counsel, Prospective Juror No. 24 consistently said that, "as a moral issue," she was "unsure" about both her right and ability to vote for a death sentence. When the trial court explored this subject by asking if there was a reasonable possibility she could consider the death penalty, she replied, "I don't know. I really don't know if I could." Upon the prosecution's questioning, Prospective Juror No. 199, who initially indicated she could consider voting for the death penalty, reversed her position and said she would be unable to return a death verdict in a case of this nature. She again reversed position when defendant's counsel questioned her, explaining that she could consider the death penalty but was likely leaning towards a life sentence. When the trial court said it needed to question her about her answers, the prospective juror burst into tears and interjected, "I'm in conflict." She explained she was having "trouble seeing" the "reality of [defendant's] life out on the street" and twice told the court she did not know whether she could vote for the death penalty. Prospective Juror No. 232, upon questioning, said she did not believe there was a reasonable possibility she could vote for a death sentence and she doubted her ability to base a decision solely upon what she heard from the witness stand. She based these doubts on her religious concerns about the death penalty and the following circumstances: she knew about the case and had

---

[2]     We decline defendant's request to reconsider this rule of deference. (See *People v. Schmeck*, *supra*, 37 Cal.4th at p. 263; *People v. Moon*, *supra*, 37 Cal.4th at p. 14.)

discussed it extensively, she knew some of the background information, and she knew some of the witnesses. These responses justified the court's decision to excuse these prospective jurors. (See *People v. Friend* (2009) 47 Cal.4th 1, 61.) Defendant points to nothing in the prospective jurors' other responses requiring a different conclusion.

### E.  Failure To Remove Prospective Jurors For Cause

Defendant next asserts the trial court prejudicially erred in denying his request to excuse for cause Prospective Jurors Nos. 36, 50, 139, 230, and 234. According to defendant, the trial court should have excused these prospective jurors because they were impermissibly biased in favor of voting for a death sentence.

For two reasons unrelated to the merits, defendant's argument fails. First, by using only 19 of his 20 peremptory challenges, defendant forfeited his claim. (See *People v. Williams* (1997) 16 Cal.4th 635, 667 ["To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so."].) Defendant asks us to abandon this forfeiture rule, asserting that it presents criminal defendants with "an 'intolerable' dilemma": the "unconscionable choice" between using the final challenge and facing a jury even more likely to vote for death due to the answers given by the next jurors to be called into the box, or preventing this by accepting the jury as constituted. In *People v. Hoyos* (2007) 41 Cal.4th 872, 904, we rejected a similar argument, explaining: "Even assuming this argument could justify [the defendant's] failure to exhaust his peremptory challenges, it is mere speculation on this record. [The] [d]efendant's contentions of erroneous jury inclusion are therefore forfeited." A similar conclusion is appropriate here. (See also *People v. Mills*, *supra*, 48 Cal.4th at p. 186 ["acceptance of this excuse would

22

swallow the [exhaustion] rule entirely, for a defense attorney might in every case wish to hold challenges in reserve for strategic reasons"].)

The second reason defendant's claim fails is that, even were we to reach the merits and find error, defendant would be unable to show prejudice. Defendant used his preemptory challenges to excuse all of the prospective jurors in question, so none of them actually sat on his jury. "[B]ecause [he] did not challenge any *sitting* juror for cause, he cannot show the court's rulings affected his right to an impartial jury. [Citations.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1099 (italics added).) Accordingly, even were his argument sound on the merits, defendant would not be entitled to relief.

In a related claim, defendant argues the trial court was not "even-handed" in its treatment of prospective jurors who favored the death penalty and those who had reservations about it. In his view, the court "spen[t] time and effort attempting to rehabilitate" the former, but "ma[de] no such efforts" with the latter. It also, he asserts, used different standards in applying the governing rules, refusing to excuse "equivocal" prospective jurors who favored the death penalty while excusing "equivocal" prospective jurors who had reservations about the death penalty. Defendant unsuccessfully raised this claim several times at trial, including through a motion to quash the venire.

For several reasons, this claim, though apparently cognizable on appeal notwithstanding defendant's failure to exhaust his peremptory challenges or the fact that none of the pro-death-penalty prospective jurors he discusses actually served on his jury (see *People v. Whalen* (2013) 56 Cal.4th 1, 42-43 (*Whalen*)), fails on its merits. Initially, we observe that, although the court questioned more than 125 prospective jurors about their death penalty views, defendant premises his claim on a comparison of only nine: four the court disqualified for cause because of their anti-death penalty views and five the court refused to disqualify for cause despite their pro-death-penalty views. "The examination of such a small number of prospective jurors constitutes an extremely limited sample of the trial

23

court's overall performance, thereby diminishing the probative value of the examples proffered by defendant to support the inference he would have us draw." (*People v. Martinez* (2007) 47 Cal.4th 399, 447 (*Martinez*); see also *Whalen*, *supra*, 56 Cal.4th at p. 39, fn. 15 [trial court's treatment of single prospective juror "cannot establish a pattern of discriminatory questioning in violation of defendant's rights"].)

In addition, as to two of the four anti-death penalty prospective jurors defendant discusses, the record belies his claim that the trial court made no effort to "rehabilitate" them when they expressed views putting their ability to serve in doubt. The trial court began its voir dire of Prospective Juror No. 232 by noting that, on her questionnaire, she indicated she had "a religious affiliation that takes a stance on the death penalty" and explained, "life should be cherished." The prospective juror interjected, "I think that life is sacred and should not be taken." The court asked whether this view would "prevent" her "from voting for the death penalty in a case." She responded, "It possibly could." The court asked her to "elaborate," at the same time reminding her that, on her questionnaire, she "indicated" she "would not automatically vote for either" the death penalty or life without possibility of parole. The prospective juror answered: "No, I wouldn't. I guess my personal feeling is the death penalty should be used for crimes where there — it has been long term like multiple murders, where, you know, children are tortured, heinous crimes, versus more of a simple — I guess no murder is simple but just a —" The court interrupted and, in an apparent effort to qualify the prospective juror for service, stated, "Well, there's a reasonable possibility in your mind that you could vote for the death penalty?" Rather than agree with the court, the juror ambiguously responded, "Possibly." Following up, the court asked, "And the religious affiliation, does that get in the way of you voting for or against the death penalty?" The prospective juror responded, "It would probably get in the way of voting for the death penalty." When the court asked, "How?" the prospective juror responded, "Because I would really have to weigh my religious

24

beliefs about not taking a life." Still apparently trying to qualify the prospective juror for service, the court asked, "But under some circumstances you can take a life?" Again, rather than agree with the court, the prospective juror responded, "I would prefer not to take a life." The court continued its effort to qualify the prospective juror, explaining, "The question, though, is in your state of mind, do you think you could make that vote, if you thought the — that it was an appropriate sentence in a case?" The prospective juror replied, "From what I have read, unfortunately, I have read a lot about this case and have talked a lot about it, I don't know if it would justify a death sentence." The court probed still further, responding: "So if I were to tell you that you were to assume that the defendant was convicted of first degree murder and the special circumstances which involve multiple murders and so on and so forth, you understand all those special circumstances? You are saying that under that situation, you could not vote for the death penalty?" The prospective juror answered, "I think I would have a hard time voting for the death penalty. So I can't say a hundred percent now, but I think I would have a hard time." The court then asked, "Is it a reasonable possibility that you could?" The prospective juror replied, "No." Probing further, the court asked, "For all practical purposes, could you impose the death penalty on anyone in this situation?" The prospective juror responded, "I don't think so." Focusing on the ambiguity in the juror's answers, the court made yet another effort to get her to agree there was at least a possibility she could impose the death penalty: "Well, we here in courtrooms play with words." "It's one thing for you to say I can't, it's another thing for you to say I don't think so. That leaves open the possibility that you could. Can you tell me about that?" The prospective juror responded, "Like I said before, I feel that the death penalty, you know, taking a person's life is something that I, because of my religious beliefs, of not killing, would be very hard for me to vote for." The court then explained it was "having difficulty with" the inconsistency between the prospective juror's comments during voir dire and her indication in her questionnaire that she "would not

25

automatically vote for either" the death penalty or life without possibility of parole. The prospective juror responded: "Right. I understand. But I also was sitting there that morning I realized later that I thought about some of the questions." The court then asked, "Tell me as you sit there now what your frame of mind is in terms of being able to vote for the death penalty." The prospective juror replied, "unfortunately, I'm not sure if I can separate what I have heard before and from what I have heard, I don't think I could vote for the death penalty." During later questioning by the prosecution, the prospective juror answered, "No," when asked, "Do you believe you are able to vote for the death of this defendant?"

The court's questioning of Prospective Juror No. 24 featured similar efforts to establish her ability to serve after she expressed views against the death penalty that put her ability to serve in question. On her questionnaire, this prospective juror indicated that, if she thought "a particular provision of the law should be different than what [the court] instructed," she would have "hesitation or reluctance about following the law as instructed." (Underlining in original.) The court asked her about this answer during voir dire, and she confirmed that she "[p]ossibly" would have a problem following the law as the court explained it. The court then attempted to educate her regarding the duty of a juror, explaining that jurors "have to follow the law" when they "take that oath." After the prospective juror interjected, "I realize that," the court continued its effort: "I noticed in one of the answers one of the jurors said, . . . I'll follow the law if I don't agree with it because the proper way is through the legislature. I would see my legislature. . . . And that's really what this is about. . . . It's not your job as a juror to determine what the law should be in this courtroom. Your job and your oath as a juror is to follow the law that I instruct you with, and our job is to say can you do that thoroughly. If you can't, we need to know that. That's where I'm at." Rather than indicate she could do what the court was asking, the prospective juror responded, "Well, I hope I would be able to do that, but I can't guarantee that I would." Later, the court made another, more successful, attempt to address a

26

problematic response on the prospective juror's questionnaire. The prospective juror had indicated that, because of the potential for the death penalty, she would hold the prosecution during the guilt phase to a standard of proof higher than beyond a reasonable doubt. During voir dire, the court asked the prospective juror whether she had heard its discussion about this subject with other prospective jurors, and whether that discussion would "change [her] answer in any way." The prospective juror responded, "I think the reason that I said that is it might be easier for me to help — since I would have a hard time passing judgment on somebody's life for the death penalty, I would think that, if they were able to prove it even more, then I might be able to, if that makes sense."[3] The court replied, "But the question is, if the law says that proof beyond a reasonable doubt is the standard, would you require more than the law requires?" The prospective juror answered, "No." The court later explored a questionnaire response in which the prospective juror indicated that background factors the law allowed her to consider, like defendant's upbringing or possible substance abuse, would not be "helpful" in deciding "whether the death penalty or life in prison without the possibility of parole is the appropriate sentence," and that she would "reject" those factors "automatically in deciding on a sentence." The court asked, "does that mean that you wouldn't take those factors into consideration in weighing whether or not the sentence was appropriate, being death or life without possibility of parole?" The prospective juror answered, "I guess maybe what I was trying to say was, if I couldn't put judgment — judge somebody else's life, then those other factors wouldn't come into play anyway because I'm not sure I could, um, convict somebody to death." The court made another effort to establish the prospective juror's ability to serve, noting that her comment in court was "a little bit different"

---

[3]    Just before this exchange, the prospective juror, explaining a questionnaire response indicating she had spoken to someone about "try[ing] to get out of this case," said, "I don't feel that, um, I could pass judgment on somebody else's life."

27

from her indication in the questionnaire that she "would consider the death penalty." The prospective juror responded, "Well, I thought about it over the weekend, and I'm not quite sure if I could." The court explored the issue further, asking the prospective juror to explain what she meant on her questionnaire when she said the death penalty was a "moral[] issue" for her. The prospective juror responded, "Well, I'm not sure that I should sit in judgment of somebody else's life. I'm not sure that I have that right to do that." The court probed further, asking, "do you think that you could make decisions of guilt or innocence." The prospective juror responded that, although she thought she "could make a decision on somebody's guilt or innocence for the crime they committed," she was "not sure" she could "make a decision on the punishment." Explaining that it "need[ed] to question" the prospective juror about her uncertainty, the court asked, "could you envision in your mind whether there is a reasonable possibility that you could vote for the death penalty?" The prospective juror answered, "I don't know. I really don't know if I could." After determining that the prospective juror could vote for life without the possibility of parole, the court stated, "So then it's not necessarily the sentence, voting for a particular sentence, it's the death penalty that concerns you." The prospective juror answered, "yes," and the court followed up by asking, "So it is the sentence, being able to say I could vote to enforce the death penalty, you have some problems with that?" The prospective juror answered, "yes." The court concluded by asking, "For all practical purposes, could you impose the death penalty on anyone." The prospective juror responded, "I don't know. I really don't know."

The preceding discussion shows that, as to these two prospective jurors, the record refutes defendant's claim that the trial court "swiftly" accepted their disqualifying remarks and discharged them without making any effort at rehabilitation. The court conducted extensive inquiries into remarks that raised doubts about the ability of these prospective jurors to serve, at times asking leading questions that offered them opportunities to change or clarify problematic

28

answers. It may be, as defendant argues, that the questions the court asked these prospective jurors in its effort to establish their ability to serve notwithstanding their expressed views against the death penalty were not identical to the questions the court asked the pro-death-penalty jurors defendant discusses. However, the requirement of evenhandedness in questioning prospective jurors about their views on the death penalty does not mandate that trial courts ask every prospective juror *identical* questions. (*Martinez*, *supra*, 47 Cal.4th at pp. 446-447.) Trial courts have broad discretion regarding the manner of conducting voir dire, including the number and nature of questions about the death penalty. (*Whalen*, *supra*, 56 Cal.4th at pp. 29-30; *People v. Stitely* (2005) 35 Cal.4th 514, 540.) Pursuant to this discretion, courts may conduct questioning "based on the individual characteristics of each [prospective] juror, including the juror's questionnaire answers and in-court demeanor." (*People v. Mills* (2010) 48 Cal.4th 158, 190.) Here, the record shows that, notwithstanding any differences in questioning, there was no meaningful difference in the trial court's effort to establish the ability to serve of Prospective Jurors Nos. 24 and 232 and its effort to establish the ability to serve of the pro-death-penalty prospective jurors defendant discusses.

Regarding the other two anti-death-penalty prospective jurors defendant discusses, defendant's claim of unequal treatment fails because their voir dire responses left the trial court with "little or no cause to believe that extensive questioning would render them eligible to serve." (*Whalen*, *supra*, 56 Cal.4th at p. 38.) In his questionnaire, Prospective Juror No. 36, on whom defendant's argument mainly focuses, answered in the affirmative when asked if he had "religious or personal <u>beliefs or opinions that would prevent [him] from sitting in judgment</u> of another person." (Underlining in original.) Explaining his answer, he wrote: "I am opposed to the death penalty." Later in the questionnaire, he indicated he "[s]trongly [o]pposed" the death penalty and explained: "I have opposed the death penalty since the time I have voted. My mother and her family are Quakers and I was taught to oppose it. I am Catholic and my religion also

29

leads me to oppose the taking of a life." He also indicated he would (1) "hold" the People to a standard of proof higher than beyond a reasonable doubt during the trial's guilt phase because of the potential for the death penalty, (2) "regardless of the evidence," "automatically vote for something other than murder with special circumstances in order to avoid the penalty phase of the trial," and (3) "[a]lways vote for life without possibility of parole" for someone "convicted of multiple murders, murder during an attempted robbery, and shooting from a car, as special circumstances." (Underlining in original.) The court began its voir dire of this prospective juror by noting that his questionnaire responses expressed "strong convictions against the death penalty" and indicated "there was no way [he] could ever vote for the death penalty." The court then asked, "Do you still feel that way?" The prospective juror replied, "Yes, I do." The court probed further, asking, "Is there in your mind any reasonable possibility that you could ever vote for a death penalty, put someone to death?" The prospective juror replied, "I don't think so. My beliefs are that I'm opposed to the death penalty." Not yet satisfied that disqualification for cause was required, the court probed further: "I just want to make sure that we are both talking about the same thing. Some people are opposed to the death penalty but would find it to be an appropriate sentence in certain circumstances. Could you find that to ever be an appropriate [sentence] given your belief?" The prospective juror responded emphatically and unambiguously, "No. No, I could not." Given the prospective juror's consistent and unequivocal answers on the questionnaire and in response to the court's three attempts to examine his anti-death-penalty views during voir dire, and " 'aided as it undoubtedly was by its assessment of [the prospective juror's] demeanor,' " nothing — including the prospective juror's indication in his questionnaire that he could follow the law as instructed by the court — required the court to make further inquiry. (See *Whalen*, *supra*, 56 Cal.4th at pp. 48-50 [given prospective juror's statements during voir dire that she could, under no circumstances, impose the death penalty, dismissal was proper despite indication on questionnaire that

30

she could set aside her opposition to the death penalty and follow the law and the court's instructions].)

Moreover, given these responses, defendant is simply incorrect in arguing that Prospective Juror No. 36 was "similarly situated" to the pro-death-penalty prospective jurors defendant discusses, Prospective Jurors Nos. 6, 50, 139, 230, and 234. In her questionnaire, Prospective Juror No. 50 indicated she strongly supported the death penalty, but also indicated she would follow the law as set forth by the court and, for a defendant "convicted of multiple murders, murder during an attempted robbery, and shooting from a car, as special circumstances," "would not automatically vote for either life without possibility of parole or the death penalty," but "would consider all evidence and decide accordingly." (Underlining in original.) During voir dire, the court, noting the prospective juror's support for the death penalty, asked whether there was "a reasonable possibility" she "could under certain circumstances vote for life without possibility of parole." She replied, "In some cases, yes. But just hearing about this in the beginning, before I was ever called to be a juror, I felt very strongly about what had happened." After explaining that what the prospective juror had heard was not evidence in a courtroom, and that jurors "are supposed to just decide this case from the evidence here," the court asked, "Can you set [your] opinion aside and decide only from what happens here in this courtroom?" The prospective juror replied, "Yes." The court then asked, "Do you see it as a reasonable possibility that you could ever vote for life without possibility of parole?" The prospective juror replied, "I think so." Defendant's counsel later asked, "based on the questions that you have in here, it seems to me that," if you found first degree murder and special circumstances, "you would automatically vote for death, based on the way you think about these crimes, is that true?" The prospective juror replied, equivocally, "I believe so." Attempting to clarify this response, the court interjected, "you mean to tell me you would, after the guilt phase is over, before you heard anything else, you would vote for the death penalty, is that what you are

31

saying." The prospective juror responded, "No. I'm saying that I would choose death if I have the right information." The court interjected, "Okay, but you would need some information, wouldn't you?" The prospective juror replied, "Right." The court then added, "And you would listen to aggravating and mitigating circumstances, would you not?" The juror answered, "Absolutely." The court then concluded its questioning by asking, "Before you decided?" The prospective juror replied, "Before I decided."

In her questionnaire, Prospective Juror No. 6 indicated she supported the death penalty, but also indicated she would follow the law as set forth by the court and, for a defendant "convicted of multiple murders, murder during an attempted robbery, and shooting from a car, as special circumstances," "would not automatically vote for either life without possibility of parole or the death penalty," but "would consider all evidence and decide accordingly." (Underlining in original.) She also indicated that background factors the law allowed her to consider, like defendant's upbringing or possible substance abuse, would not be "helpful" in deciding "whether the death penalty or life in prison without the possibility of parole is the appropriate sentence," and that she would "reject" those factors "automatically in deciding on a sentence." During voir dire, the court asked the prospective juror to explain her answers regarding background factors, and she replied, "Well, because I would be sympathetic to and feel bad for his upbringing, but I think what he did is a separate thing and he needs to be accountable for his actions regardless of that." The court then asked, "If I were to tell you the law says you need to consider certain things, would you say I'm not going to consider them, no matter what, Judge?" The prospective juror replied, "Well, no. If that's the law, then I would consider it. But that's just off the top of my head." To confirm the prospective juror's position, the court asked, "Then you would follow that law?" The prospective juror replied, "Yeah."

In her questionnaire, Prospective Juror No. 139 indicated that she "believe[d] in the death penalty for certain crimes, including murder," that the

reason she felt this way was that the death penalty "is Biblically sound," and that she would consider the death penalty, would follow the law as set forth by the court, would base punishment on the evidence and would not automatically vote for either life without possibility of parole or the death penalty, and would not automatically reject background factors in determining sentence. The relevant voir dire focused on the court's effort to clarify her statement that the death penalty was "Biblically sound." Upon the court's initial questioning, the prospective juror explained: "Well, it's called for in Leviticus, actually. So that's why I believe that it can be imposed." "[I]t's a command [that] is given Biblically and I believe in that. And that's the only — that's as far as it goes. That the death penalty is sound — is a sound matter." The court followed up by asking, "Does that mean you would always impose the death penalty?" The prospective juror replied, "No." During questioning on this subject by defendant's counsel, the prospective juror stated that the death penalty is "a Biblical truth" and added, "it is indicated in the Bible that as part of the law that, yes, if a man's life is taken, it should be redeemed with another man's life." Defendant's counsel then asked whether, if she found first degree murder and special circumstances, "which gives you by law the right to vote for the death penalty, would your belief system as to the religion kick in at that point in time and say, well, now I must vote for the death penalty at this point?" The prospective juror replied, "I believe I would have to do that. Yes." The court then had an exchange with the prospective juror "to clarify" her answers. It began by asking, "You had indicated to [defense counsel] . . . that if you got to the penalty phase, . . . your Biblical something would kick in and you would vote for the death penalty, did I understand that, what you said?" The prospective juror replied, "Yes, I would vote for the death penalty and he also said with — was it with extenuating circumstances was that the — " The court interjected, "Special circumstances." The prospective juror then continued, "Special circumstances, beyond a shadow of a doubt, if he was found guilty, with special circumstances, I believe I would stand for the death

33

penalty." The court responded, "Okay. I want to make sure I understand this clearly." After explaining that the applicable standard was beyond a reasonable doubt, not shadow of a doubt, the court continued, "So can you explain to me what you meant when you said that your Biblical views would kick in? That's what I'm not understanding." The prospective juror responded, "Well, if we went through the trial and the defendant was found guilty, according to your instructions, and then we went into the penalty phase — " The court interjected, "[a]nd there would be further instructions there also." The prospective juror continued, "Right. Which I would of course listen to because I feel it's my duty to be as fair as humanly possible. I would have to know as other people in this courtroom would, without a doubt there was a reason to take a life but I believe I could do that. I mean I believe I could vote for the death penalty, if there were no doubt." "No reasonable doubt and the instructions led me to the point where I had to make that decision." The court then asked, "Well, you would follow the law that I give you; is that correct?" The prospective juror replied, "That's absolutely correct." Concluding its inquiry, the court asked, "Would your view of the law be clouded, however, in your vote in determining penalty by your Biblical views?" The prospective juror responded, "No."

In her questionnaire, Prospective Juror No. 230 indicated she supported the death penalty, explaining that "certain crimes definitely warrant" that punishment and that "[s]ome crimes are so unforgiveable that the guilty party deserves to be removed from society." She also indicated she would follow the law as set forth by the court, would base punishment on the evidence, and would not automatically vote for either life without possibility of parole or the death penalty. Finally, she indicated that background factors the law allowed her to consider would not be "helpful" in deciding between the death penalty and life without the possibility of parole, and that she would "reject" those factors "automatically in deciding on a sentence." During the relevant voir dire, the court asked the prospective juror what she meant by an "unforgiveable crime." The prospective juror responded, "I

34

think taking an innocent person's life.  Somebody who is probably age, young ages."  When a young persons' life is taken away, "I think it needs to be punished."  The court responded, "Well, do you see as a reasonable possibility of punishment not being the death penalty in that situation that you've just described?"  The prospective juror responded, "Yes.  If I'm presented with the evidence that says that they shouldn't be put to death, yes, I could."  She then answered in the affirmative when the court asked whether she "could listen to that" and "weigh the good factors and the bad factors and then make a decision." The court then asked, "In some of these situations that you've talked about with young people and that, could you see in your own mind imposing life without possibility of parole?"  The prospective juror responded, "It would depend on the circumstances.  I don't feel that — I know the questions you've asked is previous experience, things that have happened in the person's past life, would I consider that as an excuse and have that being life imprisonment as opposed to death.  I don't think so.  I think that whatever the crime is is what the punishment should be.  Not really based on if they've had a hard time in their history."  The court responded, "Well, the law doesn't allow that.  The law says after this crime, there's a second phase.  Jurors can't just say based on that crime and those special circumstances, the death penalty or life without the possibility of parole.  They have to listen to other factors under the law of aggravation, mitigation and then make a determination.  Weigh those and come up with a decision one way or the other for one choice or the other.  Can you do that?"  The prospective juror replied, "Yes."

In his questionnaire, Prospective Juror No. 234 indicated he strongly supported the death penalty, explaining, "If the person did the crime he or she should pay for it."  He also indicated he would base punishment on the evidence, would not automatically vote for either life without possibility of parole or the death penalty, and would follow the law as instructed by the court, even if the court's instruction were different from his previous understanding of the law.  He

also indicated he would have "hesitation or reluctance about following the law" if he thought a particular provision of the law "should be different than what [he was] instructed." (Underlining in original.) Exploring these answers, the court asked during voir dire whether the prospective juror would "hesitate in following the law as I tell you?" The prospective juror replied, "follow what you say." The court then asked the prospective juror to explain his expressed view on the death penalty. The prospective juror replied, "Well, if they did it, they need to pay for it. And sir, I will tell you, if they shoot somebody that's how they die. If they hang somebody, that's how they should die. How they commit the murder is how they should go." The court responded, "You understand that the law doesn't allow that." The prospective juror replied, "I know that. That's how I feel." The court continued, "But the law does allow for two choices, if we get to a penalty phase, and only two choices." The prospective juror interjected, "True." The court continued, "One is the death penalty and the other is life without the possibly of parole. When you say a person should pay for it, can you tell me what you mean within those two choices?" The prospective juror answered, "Well, if he [is] proven to have done it without no doubt, the death penalty. If there is a waiver, could be, may not, then it's imprisonment for life." Understandably confused by this answer, the court asked, "Can you explain to me that latter part that you were just saying? I didn't quite catch it." The prospective juror replied, "If the jury votes on life imprisonment, then I will go along with it." The court responded, "Would that be just because the others are going along with that." The prospective juror answered, "No. Not really." The court explained, "You do understand that both sides have a right to [the] individual view of each juror." The prospective juror answered, "Yes." The court then turned to the issue of background factors, asking the prospective juror to explain why he had indicated on his questionnaire that such factors would not be helpful in determining punishment. The prospective juror responded, "Well, it depends on how they treat people is what I meant. If they treat people wrong constantly, then that could be a

36

factor, as far as I'm concerned." The court then asked, "Did you hear my explanation earlier about good and bad factors?" The prospective juror replied, "Yes. I go along with it." The court concluded its inquiry by asking, "Would you listen to those before you make up your mind as to what to do." The prospective juror replied, "Yes."

The preceding discussion shows that, contrary to defendant's assertion, the responses of these pro-death-penalty jurors were not similar to those of Prospective Juror No. 36. Unlike Prospective Juror No. 36, who repeatedly, consistently, and unequivocally declared her inability to impose the death penalty, these pro-death-penalty prospective jurors gave conflicting, equivocal, and/or ambiguous answers that called for further inquiry. The extent of the court's questioning properly reflects this difference, not unequal treatment of similarly situated prospective jurors. Thus, the record confirms the People's view that "[a]ny difference in the number and the nature of questions" the court asked these prospective jurors "was based on the need to gain a definitive understanding of the potential juror's position."

The record likewise shows that Prospective Juror No. 199, who is the last anti-death-penalty prospective juror defendant discusses, is not similar to the pro-death-penalty jurors discussed above. In her questionnaire, Prospective Juror No. 199 indicated she (1) had no beliefs that would prevent her from judging another, (2) would follow the law as stated in the court's instructions, (3) both "support[ed]" and would "consider" the death penalty, (4) had no religious affiliation that took a stance on the death penalty, (5) would not, "regardless of the evidence," "automatically vote for something other than murder with special circumstances in order to avoid the penalty phase of the trial," and (6) would not automatically vote for either life without possibility of parole or the death penalty, but "would consider all evidence and decide accordingly." (Underlining in original.) She also indicated she would "hold" the People to a standard of proof higher than beyond a reasonable doubt in the trial's guilt phase because of the

37

potential for the death penalty.  In explaining her position on the death penalty, she wrote:  "I have some religious conflicts but too many men and gangsters feel prison is a status symbol, a part of being in a gang.  We probably need the threat of the Death Penalty."  Asked to explain how her death penalty views had changed over time, she responded, "I was stronger for it than I am now."

The court began its inquiry regarding this prospective juror's death penalty views by asking about the "religious conflicts" her questionnaire mentioned.  The prospective juror responded, "If I'm responsible for sending someone to his death, is that going to reflect on me or on God when I go."  The court asked, "do you have some concerns about that?"  The prospective juror answered, "Little bit of concern.  I'm in conflict over it, you know.  If the person is truly guilty and they've done some terrible things, then maybe they deserve to die."  The court ended its initial inquiry by asking whether there was "a reasonable possibility" the prospective juror could vote for either the death penalty or life without the possibility of parole.  The prospective juror answered, "Yes."  The prosecution later asked the prospective juror whether, "in a case such as this, you are able to vote for death against this defendant."  The prospective juror answered, "I don't think so.  I don't think I could."  Defendant's counsel then pursued the issue as follows:  "[N]obody is going to tell you you have to vote for death in this case . . . . The only question here is will you be able to consider death and life if you got to that portion of the trial in which you had to make a determination.  Could you do that?"  The prospective juror responded, "I could consider death but I would probably lean towards the life imprisonment."  The court told the prospective juror it "need[ed] to ask [her] a couple questions, based on" her responses to the attorneys' questions.  The prospective juror interjected, "I'm in conflict."  The court continued:  "I can see that.  On the one hand you have stated that I could consider death, and on the other hand you said I don't think I could vote for death of the defendant.  Can you please explain those two answers and how you feel here?  I can see this is pretty emotional for you, pretty tough."  The prospective

38

juror responded, "Excuse me, sir," and the court stated, "Note that the witness [*sic*] is crying." The prospective juror continued: "I was sitting here . . . very respectful and I'm having trouble seeing probably what's [the] reality of this young man's life out on the street." The court tried to direct the prospective juror's focus to the question, stating: "What's at issue here is your state of mind based on the question of whether or not you could consider death and whether or not you don't think you could vote for death. Those are inconsistent." After the prospective juror responded, "I know they are," the court asked, "Can you please explain that inconsistency, so that we know what your state of mind is?" The prospective juror responded, "If the prosecution presented a case and with a really heinous crime, if it was really a terrible crime and — I don't know sir. I don't know." The court asked, "Does that mean you don't know if you could impose the death penalty?" The prospective juror answered, "That's correct. I don't know if I could do it."

The preceding discussion demonstrates that Prospective Juror No. 199 was not, as defendant asserts, similarly situated to the pro-death-penalty jurors he discusses. Over the course of the voir dire, she expressed increasing doubts about her ability to impose the death penalty, culminating in a sobbing proclamation that she was "in conflict" and did not know whether she could impose the death penalty. "Visible emotion and nervousness are factors a trial court properly may consider in evaluating a juror's demeanor, which is highly relevant to a trial court's ultimate determination. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 897-898.) Indeed, "[d]eference to the trial court is particularly appropriate" when the court bases its ruling on its personal observations of the prospective juror, including " 'the person's tone of voice, apparent level of confidence, and demeanor.' " (*People v. Cowan* (2010) 50 Cal.4th 401, 441.) Here, the trial court explained it was excusing Prospective Juror No. 199 because of her inconsistent answers and "the emotionality she showed" during its questioning. Nothing in the record suggests that any of the pro-death-penalty jurors defendant discusses

39

expressed or reflected similar emotion.  Thus, that the trial court conducted a different voir dire of Prospective Juror No. 199 properly reflects the difference in the prospective jurors' answers, rather than bias or unequal treatment.  For the preceding reasons, insofar as defendant claims the extent and nature of the trial court's voir dire were different for pro-death-penalty prospective jurors and anti-death-penalty jurors, his claim fails.

The remainder of the voir dire record further refutes defendant's claim.  It shows that the court excused several pro-death-penalty prospective jurors after conducting a brief examination very similar to the examination of Prospective Juror No. 36, the anti-death-penalty prospective juror on whom defendant principally focuses.[4]  It also shows that the court attempted to rehabilitate several anti-death-penalty prospective jurors in precisely the manner defendant now claims it should have:  by asking whether they could follow the law and consider the death penalty notwithstanding their personal opposition to it.[5]  "These

---

[4]    For example, after having Prospective Juror No. 266 explain her views on the death penalty, the court asked, "does that mean that you would automatically vote for the death penalty?"  The prospective juror replied, "I probably would."  The court asked, "do you see it as a reasonable possibility in a case where a person's been convicted of murder in the first degree, with . . . a special circumstance, that you could impose life without possibility of parole?"  After the prospective juror replied, "no," the court excused her without further questioning.  The court conducted a similar voir dire of Prospective Jurors Nos. 10, 109, 149, 163, 216, and 231, all of whom the court excused for cause because of their support for the death penalty.

[5]    After summarizing the anti-death penalty views Prospective Juror No. 64's questionnaire responses reflected, the court asked, "if you sat as a juror here and I told you that you're instructed to follow the law, based on your conscience of not being able to impose the death penalty, could you do that?"  The prospective juror answered, "I could not.  Morally I could not."  The court then excused her.  Similarly, after exploring Prospective Juror No. 146's opposition to the death penalty, the court asked, "If I were to instruct you that you had to [consider the death penalty], would you be able to do that without violating your conscience?"  The prospective juror replied, "if I am not mistaken, it was earlier stated this

*(footnote continued on next page)*

40

examples illustrate the court's effort to be fair." (*Whalen*, *supra*, 56 Cal.4th at p. 40.) For the preceding reasons, defendant's claim fails.

Defendant's claim that the court applied different standards in deciding whether to excuse the two groups of prospective jurors also fails. When defendant raised this issue at trial, the court stated it had applied the same standard to both groups of jurors: whether the prospective juror's views either "prevent" or "substantially impair" him or her "from performance of his or her duties as a juror in accordance with the juror's instructions and oath." As defendant concedes in his brief, this is the correct standard. (See *Whalen*, *supra*, 56 Cal.4th at p. 25.) The record shows that, contrary to defendant's assertion, the court applied this standard evenhandedly and properly. All of the pro-death-penalty prospective jurors defendant discusses indicated on their questionnaires and/or during voir dire that they would follow the law as set forth in the court's instructions, would not automatically impose the death penalty, and would determine sentence based on all of the evidence. The anti-death-penalty prospective jurors defendant discusses were never able to commit to all of these propositions, notwithstanding questioning from the court, the prosecution, and/or defendant's counsel.

---

*(footnote continued from previous page)*

afternoon that such instructions are not given." The court asked, "For all practical purposes, could you ever impose the death penalty on anyone?" After the prospective juror answered, "I don't envision it," the court excused him. After Prospective Juror No. 103 indicated he did not "favor the death penalty at all" and would consider it only in "extreme cases," the court asked, "Could you vote for the death penalty at all if the evidence indicated it was an appropriate sentence?" The prospective juror responded, "I think I could," and the court followed up by asking, "So there's a reasonable possibility in your mind of imposing the death penalty?" The juror answered, "Yes. I just prefer not, you know, to go there. I wouldn't want to make that choice. Let's put it that way." The court continued, "But if the law requires you to do that, can you follow the law?" The prospective juror responded, "I think so."

Prospective Juror No. 36 adhered to the view that she could never find the death penalty to be an appropriate punishment. Prospective Juror No. 24 could not assure the court that she would follow the court's instructions if she thought the law should be different or that there was a reasonable possibility she could impose the death penalty on anyone. Prospective Juror No. 199 proclaimed in tears that she was "in conflict" and did not know whether she could impose the death penalty, even for a "really heinous," "terrible crime." Prospective Juror No. 232 answered "no" when asked whether there was a reasonable possibility she could impose the death penalty, and stated she did not think she could impose the death penalty "on anyone in this situation," i.e., "convicted of first degree murder and the special circumstances which involve multiple murders and so on and so forth." This record does not support defendant's claim that the trial court unequally applied the governing standard to pro-death-penalty prospective jurors and anti-death-penalty prospective jurors.

### F. Allegedly Discriminatory Peremptory Challenges

Defendant next asserts the prosecution impermissibly used peremptory challenges to excuse prospective jurors for discriminatory reasons. Regarding the 18 prospective jurors the prosecution excused using peremptory challenges, defendant objected to removal of three African-American women, one Asian woman, one Hispanic woman, and one Hispanic man. He argues the prosecution unconstitutionally used race- and gender- based criteria to exclude these jurors, and that reversal is therefore required.

A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is

42

credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. (*Lenix*, *supra*, 44 Cal.4th at p. 612.) "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant]." (*Id.* at pp. 612-613.)

On appeal, we review the trial court's determination deferentially, "examining only whether substantial evidence supports its conclusions. [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at p. 613.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) Applying these standards, defendant's claims fail.

### 1. Prospective Juror No. 20

The prosecution used its first peremptory challenge against Prospective Juror No. 20, a 44-year-old African-American woman. Defendant objected, noting that the entire jury pool contained only six African Americans. The trial court asked the prosecution to give reasons for the challenge, thus impliedly finding a prima facie case. (*People v. Lewis* (2008) 43 Cal.4th 415, 470 (*Lewis*).) In response, the prosecution explained that the prospective juror had indicated on her questionnaire that she opposed the death penalty and had given the following reason for her opposition: "I believe many innocent people have been put to death wrongfully." The prosecution then noted that, during the court's questioning, "she said possibly she could vote for the death penalty" and that "life is a more severe punishment." The prosecution ended its explanation by noting that the prospective juror had sat on a "hung jury" in a previous murder case. Addressing only the last of the stated reasons, defense counsel responded that the prospective juror had served, not on a hung jury, but on a jury that failed to complete deliberations

43

because several jurors became ill. The trial court then overruled defendant's objection, explaining: "It's a proper use of a peremptory challenge."

Initially, we reject defendant's claim that the trial court simply accepted the prosecution's proffered justifications "at face value" and failed to perform its duty to make a sincere, meaningful and reasoned evaluation of those justifications. In *Lewis*, we rejected a similar argument, explaining: "The trial court denied the motions only after observing the relevant voir dire and listening to the prosecutor's reasons supporting [the] strike and to any defense argument supporting the motion[]. Nothing in the record suggests that the trial court either was unaware of its duty to evaluate the credibility of the prosecutor's reasons or that it failed to fulfill that duty. [Citations.] Moreover, the trial court was not required to question the prosecutor or explain its findings on the record because, as we will explain, the prosecutor's reasons were neither inherently implausible nor unsupported by the record. [Citation.]" (*Lewis*, *supra*, 43 Cal.4th at p. 471.) A similar conclusion is appropriate here. (See also *People v. Williams* (2013) 56 Cal.4th 630, 653; *People v. Jones* (2011) 51 Cal.4th 346, 361.)

We also reject defendant's claim that the record fails to support the trial court's determination. Consistent with the prosecution's explanation, the record shows that Prospective Juror No. 20's stated in her questionnaire responses that she opposed the death penalty because she "believe[d] many innocent people have been put to death wrongfully." She also stated a belief that life without parole was a more severe punishment than death. She reaffirmed her opposition to the death penalty upon questioning in court. These answers provided the prosecution with legitimate grounds for the peremptory challenge, notwithstanding prospective Juror No. 20's acknowledgement upon the court's questioning that there was a "reasonable possibility" she could vote for the death penalty and that, "if the specifics are there, [she] would be able to judge fairly on which way to go." (See *People v. Salcido* (2008) 44 Cal.4th 93, 139-140 (*Salcido*) [prosecution "may exercise peremptory challenges against prospective jurors who are not so

44

intractably opposed to the death penalty that they are subject to challenge for cause . . . , but who nonetheless are substantially opposed to the death penalty"]; *People v. McDermott* (2002) 28 Cal.4th 946, 976 (*McDermott*) [upholding challenge based on prospective juror's belief that life sentence is more severe than death].)

Defendant asserts the "actual reason" the prosecution offered for the challenge was the prospective juror's "service on a previous 'hung' jury," not her views about the death penalty. He argues that, because the prospective juror did not, in fact, serve on a hung jury, but served on a jury that failed to complete deliberations because several jurors became ill, the prosecution's stated reliance on her prior jury service "shows that [its] explanation for the challenge is merely a pretext for a hidden discriminatory purpose."

For several reasons, defendant's argument is unpersuasive. First, the prosecution's explanation, as quoted above, shows that its concern about the prospective juror's prior jury service was not, as defendant asserts, the "actual reason" the prosecution offered for the challenge, but was just one additional reason the prosecution offered *after* citing the prospective juror's opposition to the death penalty and her view of that penalty's severity relative to life imprisonment. Second, the prospective juror's testimony regarding her prior jury service was quite vague and incomplete. Responding to the court's inquiry, she stated: "The only thing that I can remember is [that the prior case] had to do with farm workers. Someone murdered somebody else in the labor camp. And that's just about all I remember because *I don't think* we actually went all the way through the process because everyone that was on the jury, the alternates were always getting hurt or somebody was falling down. So *I think* they kind of diminished everything and started all over again. *I don't remember*, you know, it going through a full trial." (Italics added.) Thus, it is unclear from the record that the prosecution's statement was even mistaken. Of course, the circumstance that a prospective juror has previously sat on a hung jury is a legitimate, race-neutral neutral reason for

45

exercising a strike. (*People v. Farnam* (2002) 28 Cal.4th 107, 137-138; *People v. Turner* (1994) 8 Cal.4th 137, 170.) Given the prospective juror's vague and uncertain testimony, the prosecution could rightly be concerned about her prior service on a jury in a murder case that failed to reach a verdict.

Finally, even had the prosecution been mistaken, the trial court did not err in rejecting defendant's challenge. As we have explained, "an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent." (*People v. Silva* (2001) 25 Cal.4th 345, 385.) "[A] 'mistake' is, at the very least, a 'reason,' that is, a coherent explanation for the peremptory challenge. It is self-evidently possible for counsel to err when exercising peremptory challenges. . . . [A] genuine 'mistake' is a race-neutral reason. Faulty memory, clerical errors, and similar conditions that might engender a 'mistake' . . . are not necessarily associated with impermissible reliance on presumed group bias. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 188–189.) Thus, the purpose of a hearing on an objection to a peremptory challenge "is not to test the prosecutor's memory but to determine whether the reasons given are genuine and race [or gender] neutral." (*People v. Jones*, *supra*, 51 Cal.4th at p. 366.) Where the record suggests that a mistake may underlie the prosecution's exercise of a peremptory challenge, " 'we rely on the good judgment of the trial courts to distinguish bona fide reasons . . . from sham excuses belatedly contrived to avoid admitting acts of group discrimination,' " and "give great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose. [Citations.]" (*Williams*, *supra*, at p. 189.) Given the ambiguity regarding the prospective juror's prior jury service and the prosecution's articulation of other, unquestionably legitimate grounds for the challenge, we find no error in the trial court's ruling.

### 2. *Prospective Juror No. 59*

The prosecution used its third peremptory challenge against Prospective Juror No. 59, a 51-year-old African-American woman. Defendant's counsel

objected, answering in the affirmative when the court asked if the objection presented the "same issue" as the objection to the dismissal of Prospective Juror No. 20. The court then turned to the prosecutor, saying simply, "Mr. Alkire." The prosecutor responded: "The juror stated in [the questionnaire] that she had religious or personal beliefs or opinions that would prevent her from sitting in judgment of another person. She checked the box that says yes, and answered I am one of Jehovah's Witnesses. Based on my personal past history in selecting juries, there have been a number of occasions when Jehovah's Witnesses have made similar statements and indicated they were unable to sit in judgment. That goes for guilt or penalty in this case." The prosecution further explained that, in answering a question about her views on the death penalty, Prospective Juror No. 59 was "the only prospective juror who invented a new category, and she called it neutral, and checked it. And then she explained, I cannot sit as juror to sentence another human being to die. I am not a judge, and underline the word judge twice. Further, [when asked,] is there a particular reason why you feel as you do about the death penalty, she said, yes, I cannot judge another human being on this either. This is our creator's right to judge mankind." Finally, the prosecutor added: "[I]n discussing this juror with my investigator, who was observing her answers to the court's questions in which they sort of backtracked from this and created kind of artificial distinction between a reference to the four walls of the courtroom and her religious views, he personally felt that she was not being truthful in trying to create that artificial distinction. I have a bad feeling about her."

In overruling defendant's objection, the trial court then stated: "This does not appear to me to be a race biased use of a peremptory challenge. I do remember quite well this particular juror in the questioning, . . . where she did make a differentiation between wanting to sit in judgment but could do that because she had to submit to the civil authorities under civil law. I do not see this as being race based."

47

Defendant's challenges to the court's ruling are unpersuasive. For reasons set forth above, insofar as defendant claims the trial court failed to perform its duty to make a sincere, meaningful and reasoned evaluation of the prosecution's justifications, we disagree. We also reject his reliance on the fact that, during voir dire, the prospective juror stated she would, "if called into jury service," "obey the laws of the land" and "have to follow the law." Notwithstanding these statements, the prosecution was entitled to rely on the prospective juror's earlier statements that she did not believe in sitting in judgment of others and that she could not sit as a juror to sentence another person to die. (See *Lewis*, *supra*, 43 Cal.4th at p. 474 [prosecution "reasonably could have believed" that questionnaire answers "reflect[ing] some hesitation about the death penalty" showed prospective juror's "true feelings and undermined her assurance on voir dire that she would not automatically vote for life imprisonment without possibility of parole"].)

### 3. *Prospective Juror No. 47*

The prosecution used its fourth peremptory challenge against Prospective Juror No. 47, a 33-year-old Hispanic man. Defendant's counsel objected, indicated his intent to object each time the prosecution challenged a minority, and added: "This is a Latino man of 33 years of age. Answered his questions in the questionnaire, he would consider the death penalty. He was not automatic in either direction. Doesn't have anything I recall as being particularly pro to the prosecution or negative to the defense. And he gave as much as anything, your Honor, the people of Latin, of Latino, extraction have a right to be on a jury in this country and this right is not only our client's right to have a cross-section of the community but his right to be on the jury or other juries." Finding no prima facie case, the trial court overruled the objection without asking the prosecution to state reasons for the challenge.

48

The trial court did not err.[6] To begin with, defendant's showing was meager; his counsel did nothing more than point out that the prospective juror was Hispanic, that he said he would consider the death penalty, and that his answers were not particularly in favor of the prosecution or negative to the defense. Next, the record does not show that the prosecution used a disproportionate number of its peremptory challenges against members of Prospective Juror No. 47's ethnic group and does not disclose how many other Hispanic were in the jury pool.[7] It is also significant that defendant is not a member of the prospective juror's ethnic group. (*People v. Bell* (2007) 40 Cal.4th 582, 598-599.) Finally, the record discloses obvious race-neutral reasons for excusing the prospective juror: he and two of his brothers had previously been convicted of crimes in prosecutions conducted by the Monterey County District Attorney's Office, the same office that was prosecuting defendant. The prosecution could rightly be concerned about these circumstances notwithstanding the prospective juror's statement that, despite his experiences, he did not have a negative opinion of law enforcement or the district attorney's office. On this record, the trial court did not err in finding no prima facie case.

### 4. Prospective Juror No. 32

The prosecution used its eighth peremptory challenge against Prospective Juror No. 32, a 44-year-old African American woman. Defendant's counsel objected, arguing that there were no obvious grounds for disqualification and noting that the prosecution had used three of the eight peremptory challenges it

---

[6]     Because the trial here predated the United States Supreme Court's decision in *Johnson v. California* (2005) 545 U.S. 162, and it is unclear exactly what standard the trial court used in finding no prima facie case, we independently review the record to determine the sufficiency of defendant's showing. (*Salcido*, *supra*, 44 Cal.4th at p. 137.)

[7]     Two Hispanic men and two Hispanic women ultimately sat on defendant's jury.

had exercised to remove African American women, leaving only one African American in the jury pool. Without waiting for the court's response, the prosecution interjected: "This is a woman who . . . stated she is not really sure if she could vote for the death penalty. She is a person whose brother was himself prosecuted for assault and armed robbery. I'm always concerned when jurors have close relatives like that who themselves have been prosecuted on serious offenses. In addition, she is someone who feels the death penalty is an easy way out, that that person should be made to think about the crime for the rest of their life rather than take the easy way and the death penalty. Between this feeling that that's the easier way out and the fact that she specifically expressly said she is not really sure if she could vote for the death penalty, I am extremely uncomfortable with someone sitting on the jury who herself can't vote for death." Defendant's counsel interjected that the prospective juror's answers were neutral and that the prosecution's use of four of his first eight peremptory challenges to remove racial minorities sent a "chilling message about their lack of equality." The prosecution replied that most of the people then seated on the jury were minorities and that no basis existed to infer that it was singling out minorities in exercising its challenges. The trial court overruled defendant's objection, stating: "I do not believe after listening to [the prosecutor] that this is race based."

Defendant's challenges to the court's ruling are unpersuasive. For reasons set forth above, insofar as defendant claims the trial court failed to perform its duty to make a sincere, meaningful and reasoned evaluation of the prosecution's justifications, we disagree. We also reject his attacks on the prosecution's stated grounds for the challenge. It is true, as defendant observes, that the prospective juror stated during voir dire that she had not seen her brother for about 19 years and that she could vote for the death penalty in an appropriate case, depending on the evidence. Notwithstanding these statements, the prosecution was entitled to rely on the prospective juror's familial relationship to her convicted brother and her statements that she considered the death penalty to be "an easy way out," that

50

convicted murderers "should be made to live the rest of their life to think about the crime," and that she leaned towards a life sentence because she considered it to be more severe than death. (See *Salcido*, *supra*, 44 Cal.4th at p. 139; *Lewis*, *supra*, 43 Cal.4th at p. 474; *McDermott*, *supra*, 28 Cal.4th at p. 976.) And the trial court, which personally heard from the prospective juror during voir dire and heard the parties' arguments, was entitled to believe the prosecution's explanation.

### 5. *Prospective Juror No. 156*

The prosecution used its 13th peremptory challenge against Prospective Juror No. 156, a 46-year-old Hispanic woman. Defendant's counsel objected, commenting that the prosecution had used five of the 13 peremptory challenges it had exercised to remove "ethnic minorit[ies]," that those challenges had produced a jury primarily free of minorities, and that the resulting jury would be "overwhelmingly nonminority." After noting that Prospective Juror No. 156 was only the second Hispanic person the prosecution had challenged and that he had used most of his challenges against Caucasians, the prosecutor explained: "She is extremely weak on the death penalty. Although she checked the box that said will consider it, she then failed to put any explanation for [her answer] and her explanation [to] the court when she finally gave it was that only after every avenue of testimony and evidence was exhausted would she begin to consider the death penalty. She also characterized it as very difficult for her to consider the death penalty. Also characterized it as a possibility she might consider the death penalty. In answer to questions 59 and 60, she did not basically understand either of the questions on here. She has no prior jury experience. Based on what I saw in her answering those questions, as well as filling out this questionnaire, she is not going to come back with a death verdict in any case, so far as I can tell." The trial court then overruled defendant's objection, stating: "I didn't think that the exercise of his peremptory challenge is race based."

Defendant's challenges to the court's ruling are unpersuasive. For reasons set forth above, insofar as defendant claims the trial court failed to perform its

51

duty to make a sincere, meaningful and reasoned evaluation of the prosecution's justifications, we disagree. We also reject his attacks on the prosecution's stated grounds for the challenge. Defendant argues that the prospective juror "had no qualms whatsoever about the death penalty" and no "reservations about [its] morality," that "[h]er concerns were for the reliability of convictions, not the nature of the penalty itself," and that "the gravamen of [her] answers was that she would want to be very careful about convicting a person who could be sentenced to death and want to be sure that that the person deserved the penalty." This argument ignores two of the prosecution's stated concerns: that the prospective juror had no prior jury experience and did not understand two of the questions on the questionnaire. These are legitimate, nondiscriminatory grounds for exercising a peremptory challenge. (See *People v. Reynoso* (2003) 31 Cal.4th 903, 925 [lack of jury experience]; *People v. Turner*, *supra*, 8 Cal.4th at p. 169 [ability to understand].) Defendant's argument also takes a one-sided view of the prospective juror's answers. During voir dire, the prospective juror indicated "it would be very difficult" for her to vote for death and that she could consider that penalty "only after every avenue of testimony and evidence was exhausted." Although these statements may have been equivocal enough to avoid disqualification for cause, they provided legitimate, nondiscriminatory grounds for exercising a peremptory challenge. (*People v. Jurado* (2006) 38 Cal.4th 72, 106 [prospective juror's statement that she would " 'find it difficult' " to vote for death "provided a permissible basis" for exercise of peremptory challenge]; *Salcido*, *supra*, 44 Cal.4th at pp. 139-140 [prosecution "may exercise peremptory challenges against prospective jurors who are not so intractably opposed to the death penalty that they are subject to challenge for cause . . . , but who nonetheless are substantially opposed to the death penalty"].) The record thus supports the trial court's ruling.

*6. Prospective Juror No. 200*

The prosecution used its 16th peremptory challenge against Prospective Juror No. 200, a 40-year-old woman who was born and raised in the Philippines. Defendant's counsel objected, stating: "The motion is that *Wheeler* simply indicates this woman both being a minority and Asian, but also I think if the court will recall, and I don't have accurate statistics up to this moment. In the first 13 challenges the prosecutor exercised, 10 were women and three were of men and now I don't know what the number is now, but it's at least 11 to three, I don't know what the last couple have been. But seems to me that there are a number of women that are left in the box, seems to me there is an exclusion of undue exercise of peremptory challenges as to women." The court interjected, "This is gender issue," to which defendant's counsel responded, "yes." Counsel then stated, "It's on gender of the 16 challenges, twelve have been to women, four have been of men and it's a pattern that cannot be denied." The prosecution responded, "Seven out of eleven right now are women." The court then overruled the objection, stating: "I do not believe this rises to the level of even a prima facie showing of improper exercise of peremptory challenges."

Defendant argues he made a prima facia showing that the prosecution impermissibly excused Prospective Juror No. 200 based on both her ethnicity and her gender. Regarding the former, as the preceding discussion shows, defendant's counsel did nothing at trial other than to observe that the prospective juror was "a minority and Asian." Both this court and others have declined to recognize "minority jurors" as a cognizable group for purposes of a claim that the prosecution has excused a prospective juror for discriminatory reasons. (See *People v. Davis* (2009) 46 Cal.4th 539, 583; *People v. Neuman* (2009) 176 Cal.App.4th 571, 578; *Gray v. Brady* (1st Cir. 2010) 592 F.3d 296, 305-306; *People v. Greene* (2001 N.Y. App. Div.) 724 N.Y.S.2d 344.) And defendant made no showing that the prosecution had excused any other prospective juror of the

same ethnicity.   For these reasons, his claim fails insofar as he bases it on the prospective juror's ethnicity.

It also fails insofar as he bases it on the prospective juror's gender.  The record shows that, before exercising a peremptory challenge against Prospective Juror No. 200, the prosecution accepted the jury as constituted six times.  The first four times, there were 4-6 women on the panel.  The last two times, there were 7 women on the panel, including a woman in the seat that Prospective Juror No. 200 later occupied, whom *defendant* subsequently excused.  The prosecution's acceptance of panels containing other women strongly suggests that gender was not a motive in its challenge to Prospective Juror No. 200.[8]  (See *People v. Dement* (2011) 53 Cal.4th 1, 19-20; *People v. Garcia* (2011) 52 Cal.4th 706, 747-748; *People v. Lenix* (2008) 44 Cal.4th 602, 629.)

Moreover, the record discloses obvious gender and race neutral reasons for excusing this prospective juror.  Specifically, the prosecution could have been concerned about the prospective juror's views on the death penalty and the severity of a life prison sentence.  Regarding the latter, when asked whether she had an opinion as to whether "death or life in prison is a more severe punishment," the prospective juror answered "yes" and explained:  "Being in prison is not exactly living a 'quality' life.  Also watching behind your shoulder or living in fear that other inmates might kill you is probably very difficult."  Regarding the former, after indicating on her questionnaire that she would consider the death penalty, she explained that the "death penalty <u>must</u> <u>really</u> be warranted," and that she held this view because she had "heard instances on television where [the] death penalty was warranted but later found out [the defendant] was innocent due to certain evidence not looked into."  (Underlining in original.)  The prosecution could have been concerned about these answers notwithstanding the prospective

---

8       Seven women ultimately sat on the jury, including a woman in the seat that Prospective Juror No. 200 had occupied.

54

juror's subsequent acknowledgment during voir dire that she would follow the reasonable doubt standard and would not require anything greater of the prosecution. On this record, the trial court did not err in finding that defendant failed to make a prima facie showing regarding Prospective Juror No. 200.

### G. Electric Shock Belt

Defendant next argues the trial court violated his constitutional rights to due process, to counsel, and to a fair trial and reliable penalty determination by ordering him to wear an electric shock belt during trial without first requiring a showing of "manifest necessity." The court compounded this error, he asserts, by failing to instruct the jury not to draw any inferences from the device's use.

This issue first arose in December 1998, when the sheriff's department asked the court to order defendant to wear the belt. The court noted the request on the record, commenting that it had seen nothing to warrant such an order and that it would have to hold a hearing if the sheriff wanted to pursue the matter. Defendant's counsel later moved for an order forbidding the use of restraints during trial. At a hearing in July 2000, the court deferred ruling on the motion, explaining that it wanted to review the record to determine whether it had previously ruled on the issue, that it was not sure "off the top of [its] head" what legal standards governed the use of an electronic belt (as opposed to shackles), and that it needed updated information regarding defendant's conduct. During a pretrial hearing in September 2000, defendant's counsel informed the court that defendant had agreed to wear the belt "in lieu of shackles or any other form of restraint." Based on this representation, the trial court ordered defendant to wear the belt during trial, and he did so.

Initially, the People are correct that, on this record, defendant has forfeited appellate review of this issue. We recently reached a similar conclusion on a similar record in *People v. McWhorter* (2009) 47 Cal.4th 318, 375. There, in response to defense counsel's request that the defendant be unshackled, the trial

55

court ordered removal of the defendant's waist chains, but not of his leg restraints, reasoning that the defendant was seated at counsel table and the leg restraints could not be observed by others in the courtroom. (*Ibid*.) We unanimously found that defense counsel, though initially requesting unshackling, "thereafter acquiesced in the remedy selected by the trial court . . . and made no further objection, thereby waiving any claim on appeal with respect to the absence of further inquiry into the manifest need for the concealed leg restraints. [Citations.]" (*Ibid*.) Here, defendant, through his motion, initially objected to the use of either shackles or a stun belt, but after the trial court expressly deferred the issue, he not only failed to press for a ruling, he informed the court he would wear the belt "in lieu of shackles or any other form of restraint." Given this record, defendant may not now raise the issue on appeal.

In any event, even had defendant preserved review of the issue, and even were we to find error, defendant would not be entitled to relief. Nothing in the record suggests that any juror saw the belt, and " '[w]e have consistently found any unjustified or unadmonished shackling harmless' " absent such evidence. (*People v. Foster* (2010) 50 Cal.4th 1301, 1322.) Defendant argues that, although he requested no instruction regarding the belt, the court should have instructed the jurors sua sponte to "disregard the defendant's demeanor that may be attributed to the presence of a device capable of causing permanent injury or death upon accidental activation." However, as we have previously held, when restraints are not visible to the jurors, the court should not give such an instruction absent the defendant's request, because "it might invite initial attention to the restraints and thus create prejudice [that] would otherwise be avoided." (*People v. Duran* (1976) 16 Cal.3d 282, 292.) Defendant also argues the physical threat the belt posed had "psychological impact[s]" that "impair[ed]" his "ability to participate in the defense." However, his argument lacks any support in the record and is inconsistent with his express agreement at trial to wear the belt and his failure to mention the issue in his new trial motion. (Cf. *People v. Howard* (2011) 51

Cal.4th 15, 28-30 [finding any error in requiring the wearing of a stun belt harmless based on the defendant's failure to express discomfort, defense counsel's failure to alert the court that the defendant was apprehensive, the absence of any plausible reason for nervousness about a stun belt being activated, and the defendant's failure during sentencing to mention the stun belt].)  For these reasons, we reject defendant's claim.

### H.  Sufficient Evidence of Aggravated Mayhem

In California, "[a] person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." (§ 205.)  The People concede, and defendant agrees, that this definition makes aggravated mayhem a specific intent crime, such that conviction requires proof beyond a reasonable doubt "that the defendant acted with the specific intent to cause a maiming injury." (See *People v. Assad* (2010) 189 Cal.App.4th 187, 195 ["Aggravated mayhem requires the specific intent to cause the maiming injury."].)

Defendant argues the evidence was insufficient to establish this intent and, thus, to sustain his aggravated mayhem conviction.  He does not contend the injuries Aninger sustained — a gunshot wound to the head requiring two surgeries and a gunshot wound to the arm requiring a nerve graft to restore hand function — do not constitute "permanent disability or disfigurement." (§ 205.)  Instead, he asserts the evidence does not show "that any of the participants intended to inflict [on Aninger] a permanent or disfiguring injury," but shows only "a sudden and indiscriminate attack following closely upon the heels of an ineffectual attempt at robbery."  After noting that his conviction was based on a theory of aiding and abetting, he further asserts that aggravated mayhem was not a natural and probable consequence of the attempted robbery.

57

In evaluating defendant's claim, "we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict — i.e., evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*), italics omitted.)

Regarding a specific intent element of a crime, we have explained that "[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) Moreover, the standard of review that applies to insufficient evidence claims involving circumstantial evidence is the same as the standard of review that applies to claims involving direct evidence. "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances

reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*Zamudio*, *supra,* 43 Cal.4th at pp. 357-358.)

Applying these principles, we reject defendant's claim. As defendant suggests, a juror perhaps could have concluded from the evidence that the Aninger shooting was only "a sudden and indiscriminate attack" prompted by "frustration" about the "ineffectual" robbery attempt. But, for several reasons, a juror also could have reasonably concluded otherwise. First, upon getting no response to his demand for money, Willover, whose head and hand were already hanging out of the car, did not simply react and immediately begin firing. Instead, he first turned back into the car, toward its other occupants, so he could comment on what had transpired. Only after making his comment did he turn back toward the women, stick his hand out of the window, point his gun and start firing. Second, contrary to defendant's claim, there was evidence from which a juror could have reasonably concluded that Willover "direct[ed] fire toward a specific body part." Willover shot Aninger from very close range — only five to 10 feet — hitting her once in the face — her forehead — and once in the upper arm, near her face. This evidence, viewed in the light most favorable to the prosecution, reasonably supports the inference that Willover did not, as defendant asserts, fire indiscriminately, but focused his attack on Aninger's head, which is a particularly vulnerable part of the body. In prior decisions, we have held that the fact the victim was shot in the head can support an inference of an intent to kill. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1071; *People v. Turner* (2004) 34 Cal.4th 406, 422; *People v. Mayfield*, *supra*, 14 Cal.4th at p. 768; *People v. Adcox* (1988) 47 Cal.3d 207, 240.) We now find that the same fact can support an inference of an intent to cause permanent disability or disfigurement. "It takes no special expertise to know that [several shots fired at someone's head] from close

59

range, if not fatal, [are] highly likely to disable permanently." (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 835 ["shot in the neck"].)

Supporting this analysis is our recent decision in *People v. Santana* (2013) 56 Cal.4th 999 (*Santana*), which involved a conviction for attempted mayhem under section 203. After explaining that the defendant's conviction was based on a "disabling injury" (*id.* at p. 1002), and that such an injury involves a disability that is "more than 'slight and temporary' " (*id.* at p. 1007), we unanimously held that evidence the defendant "stood at close range and fired three shots with a .380-caliber revolver into the [victim's] leg and buttock area" as the victim "lay unresisting on the ground" "*strongly support*[*ed*] a finding that [the] defendant intended to inflict a disabling injury" (*id.* at p. 1012, italics added). Consistent with that conclusion and our duty to view the evidence in the light most favorable to the prosecution, we find here that the evidence Willover, from close range, fired two shots into the face and upper arm of an unresisting Aninger supports a finding that he intended to cause permanent disability.[9]

The third reason defendant's claim fails is that there was powerful evidence the impetus for the Aninger shooting was something other than frustration resulting from an ineffectual robbery. As defendant drove away from the scene, Willover said, "we couldn't leave witnesses," and defendant "just kind of laughed" in response. This evidence, viewed in the light most favorable to the prosecution, reasonably supports the conclusion that shooting Aninger in the head was not a sudden and indiscriminate act of frustration, but was a deliberate and

---

[9] In rejecting this conclusion, Justice Werdegar's concurring and dissenting opinion all but ignores our recent decision in *Santana*. (See conc. & dis. opn. of Werdegar, J., *post*, at p. 8, fn. 6.) It fails to explain why, as *Santana* unanimously held, the firing from "close range" of three shots into the leg and buttock area of an unresisting victim "strongly supports a finding" of "inten[t] to inflict a disabling injury" (*Santana*, *supra*, 56 Cal.4th at p. 1012), but the firing from close range of two shots into the face area of an unresisting victim does not.

calculated effort to silence her as a witness, either by killing her or by inflicting some other "permanent disability" — such as brain damage — that would prevent her from identifying her assailants. (Cf. *People v. Whisenhunt* (2008) 44 Cal.4th 174, 202 [evidence of defendant's actions after inflicting fatal wounds support finding regarding intent to kill]; *People v. Lookadoo* (1967) 66 Cal.2d 307, 315 [evidence of the circumstances after the killing is competent to show deliberation and premeditation].) "[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful," and evidence that is sufficient to establish a defendant's intent to kill the victim can also be "sufficient to establish the intent to permanently disable or disfigure that victim." (*People v. Ferrell*, *supra*, 218 Cal.App.3d at pp. 833-834; see also *People v. D'Arcy* (2010) 48 Cal.4th 257, 297 ["the evidence showed that defendant had concurrent intents to maim and murder" the victim].)[10]

The evidence, viewed in the light most favorable to the prosecution, also reasonably supports the conclusion that the Aninger shooting was the result, not of frustration, but of a desire shared by defendant and Willover to shoot someone simply for sadistic pleasure. Willover made almost no effort to rob Mathews and Aninger; he did not even get out of the car. Instead, he simply sat in the passenger seat, leaned out, and said, "give me your money." He quickly abandoned any thought of robbery and started shooting from very close range, not because of the women's refusal to comply or attempt to escape, but simply because they did not hear him. After the shooting, neither Willover nor defendant made any attempt to take anything from their wounded and helpless victims; instead, they immediately drove away. Nothing in the record suggests that, as they did so, they expressed

---

**10** Consistent with these decisions, we disagree with Justice Werdegar's concurring and dissenting opinion that, except in rare and exceptional cases, an intent to kill and an intent to cause permanent disability are mutually exclusive, such that evidence sufficient to show the former necessarily precludes a finding of the latter. (Conc. & dis. opn. of Werdegar, J., *post*, at pp. 6-8.)

any regret, frustration, anger, or disappointment about not having obtained any money. Instead, Willover acted "[h]appy," "[l]ike he was proud of what he" had done, and congratulated defendant on the shootings. Defendant also seemed "happy," "looked like he was proud of" Willover, and congratulated Willover. Defendant "just kind of laughed" when Willover said they "couldn't leave witnesses." Willover "bragg[ed] about how" it had been four years since he had done something like that, and remarked that "it felt good."

There was evidence regarding the Olivo murder that also reasonably supports the conclusion that the actions of defendant and Willover were driven by a shared desire to shoot someone simply for sadistic pleasure. After commenting about how "good" it had felt to shoot Mathews and Aninger, Willover said that defendant "needs to try it." Defendant said he "wanted to have his turn" and wanted to "try to show [Willover] up." He then drove around "looking for anybody walking down the street, just so he could shoot them," "[j]ust because he wanted his turn to shoot somebody." After the group spotted Olivo, Willover, who "knew" they were "driving around looking for someone for defendant to shoot," asked defendant, "are you going to shoot her," or are you going "to do her," or are you going to "do it to her."[11] Defendant nodded and, "like all bragging," said, "watch this." He then maneuvered the car so his seat was closest to Olivo, stopped about five to 10 feet away from her, and gestured for her to approach. As she looked inside the car, defendant, without saying a word or making any attempt to rob Olivo, put his hand out of the window and started

---

[11] The testimony that defendant and Willover were looking for someone defendant could shoot came from Contreras during the prosecution's redirect examination. Contreras had earlier testified that the group was looking for someone defendant could rob. Upon later reviewing a transcript of her interview with police just three days after the shootings, she confirmed statements during that interview that defendant and Willover were looking, not for someone to rob, but for someone defendant could shoot. The latter testimony is consistent with the evidence that defendant shot Olivo without making any attempt to rob her.

firing. Olivo cried out, "please don't," but defendant continued shooting, firing a total of eight or nine shots. After the shooting, he made no effort to take anything from Olivo; he simply left her there and sped away, laughing about what he had done. Willover was "laughing with him." They were "taking it like kind of a game." That night, as defendant watched a television news report about the shootings, he had "a smile on his face" and repeatedly pointed alternatively at his chest and the television. From all of this evidence, a juror reasonably could have concluded that the Aninger shooting was not, as defendant asserts, a "sudden and indiscriminate attack" born of "frustration" over an "ineffectual" robbery attempt, but was the result of a desire defendant and Willover shared to kill or to cause permanent disability, either to silence potential witnesses or simply for sadistic pleasure.

This discussion necessarily refutes defendant's argument regarding his liability as an aider and abetter, i.e., that aggravated mayhem was not a natural and probable consequence of the attempted robbery. From the evidence, a juror reasonably could have found that aggravated mayhem was a natural and probable consequence of either the robbery defendant and Willover attempted to perpetrate against Aninger and Mathews, or their purpose to shoot someone for sadistic pleasure. A reasonable person in defendant's position would have or should have known that aggravated mayhem was a reasonably foreseeable consequence of either plan. (See *People v. Medina* (2009) 46 Cal.4th 913, 920 [consequence need not have been a strong probability, but only, "under all the factual circumstances of the individual case," a possible consequence that might reasonably have been contemplated].) Thus, the evidence was sufficient to support defendant's aggravated mayhem conviction.

This conclusion is not, as defendant and Justice Werdegar's concurring and dissenting opinion asserts, inconsistent with *People v. Sears* (1965) 62 Cal.2d 737 (*Sears*). (Conc. & dis. opn. of Werdegar, J., *post*, at p. 4.) There, based partly on a confession, a jury convicted the defendant of the first degree murder of his

63

stepdaughter, Elizabeth. We reversed the conviction because the defendant was not advised of his right to counsel or his right to remain silent. (*Sears*, at pp. 740-744.) "For guidance of the [trial] court on retrial" (*id*. at p. 740), we also stated that (a) to obtain a conviction based on the theory of "felony murder mayhem," the prosecution must show that the defendant acted with the "specific intent to commit mayhem," and (2) the prosecution cannot make this showing with evidence that the defendant turned on Elizabeth and struck her "several times with a steel pipe" when she happened upon his ongoing assault on her mother and shouted at him to stop. (*Id*. at p. 745.) "[S]uch evidence," we stated, "does no more than indicate an indiscriminate attack." (*Ibid*.) Unlike the evidence in *Sears*, which showed only an unplanned and reactive attack with a steel pipe on someone interceding in an ongoing assault on another victim, the evidence here, as discussed above, showed a deliberate and planned shooting, focused on the victim's head, in order to prevent the victim from identifying her assailants and/or for sadistic pleasure. As also discussed above, this evidence reasonably justifies the jury's finding of an intent to cause permanent disability or disfigurement.

Likewise distinguishable is *People v. Anderson* (1965) 63 Cal.2d 351, on which defendant and Justice Werdegar's concurring and dissenting opinion also rely. (See conc. & dis. opn. of Werdegar, J., *post*, at pp. 4-5.) In that case, which involved the killing of a 10–year–old–girl, there was no witness to the crime, only physical evidence of the attack, including "[t]he victim's torn and blood-soaked clothes" and 61 knife wounds "ranging over [her] entire body from head to the extremities." (*People v. Anderson*, *supra*, at p. 356.) This physical evidence, we concluded, was alone insufficient to establish the "specific intent to commit mayhem" necessary for a first degree felony murder mayhem conviction. (*Id.* at p. 359.) It did "no more than indicate an indiscriminate attack" (*ibid*.) during "an explosion of violence" (*id*. at p. 360). Unlike in *Anderson*, where the physical evidence indicated an unfocused and indiscriminate attack on the victim's "entire body" (*id*. at p. 356), in this case, as discussed above, the physical evidence

64

reasonably supports the conclusion that Willover focused his attack on Aninger's head. Moreover, whereas in *Anderson,* no one testified about how or why the defendant attacked his victim, in this case, as discussed above, there was substantial testimony about the words and actions of defendant and Willover before and after the Aninger shooting, evidence from which a reasonable juror could infer the specific intent to cause permanent disability or disfigurement.

"Distilled to their essence," the contrary arguments of defendant and Justice Werdegar's concurring and dissenting opinion are "more properly advanced to a jury" because they depend on drawing "inferences favorable to [defendant] from the facts to show [no] specific intent to [cause permanent disability]. That approach is inapplicable on appeal. '[E]ven though the appellate court may itself believe that the circumstantial evidence might be reasonably reconciled with the defendant's innocence, this alone does not warrant interference with the determination of the trier of fact. [Citations.] Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.] As explained earlier, the record contains substantial evidence from which a reasonable jury guided, as here, by proper instructions on the controlling legal principles could have found beyond a reasonable doubt . . . [a] specific intent to [cause permanent disability]." (*People v. Park* (2003) 112 Cal.App.4th 61, 71-72, italics omitted.)

### I. Accomplice Instructions

Based on the trial testimony, defendant asked the trial court to find that Contreras and Tegerdal were accomplices as a matter of law and to instruct the jury that, as accomplices, their testimony required corroboration. The trial court denied the request, finding that the evidence presented a factual question for the jury to resolve as to whether Contreras and Tegerdal had intended to provide aid and assistance in the crimes' commission. Accordingly, it instructed the jurors

65

that, if they found Contreras and Tegerdal to be accomplices, their testimony required corroboration. Defendant asserts the trial court's ruling constitutes prejudicial error because the evidence established that Contreras and Tegerdal were accomplices as a matter of law.

In California, "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111.) For purposes of this rule, an "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid*.) "This definition encompasses all principals to the crime [citation], including aiders and abettors and coconspirators. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) As defendant explains in his brief, liability as an aider and abettor requires proof that the person in question "aid[ed] or promote[d] the perpetrator's crime with knowledge of the perpetrator's unlawful purpose and an intent to assist in the commission of the target crime." (*People v. Williams* (2008) 43 Cal.4th 584, 637, italics omitted.) As defendant also explains in his brief, whether a witness is an accomplice is a question of fact for the jury unless no reasonable dispute exists as to the facts or the inferences to be drawn from them. (*People v. Valdez* (2012) 55 Cal.4th 82, 145-146 (*Valdez*).)

Defendant implicitly concedes that neither Contreras nor Tegerdal was a direct perpetrator of the crimes. He argues, however, that both were nevertheless liable as principals because they "knew of and shared the intent to rob" and "actively assisted and encouraged in [*sic*] the events." Regarding the crimes against Aninger and Mathews, defendant argues: "Contreras and Tegerdal were more than mere passengers. Tegerdal had provided the car, knowing that robbery was an activity that they would engage in. Contreras, with the same knowledge, had driven the car during the unsuccessful search for earlier robbery subjects and it was only a matter of chance that she was not driving when Willover shot

66

[Aninger and Mathews]. Had that robbery been successful, both Contreras and Tegerdal expected to share in the proceeds." Regarding the Olivo shooting, defendant argues: "Despite a clear opportunity to depart after the first shootings, [Contreras and Tegerdal] elected to stay with [defendant] and Willover when they reached Tegerdal's house. Tegerdal provided a different automobile in case the first had been seen at the first shooting and initially drove that car. Although not their sole activity, they continued to be on the lookout for potential robbery targets, and were not in the car by happenstance or with ignorance of the fact that the events at the wharf could recur. Neither expressed disapproval of the earlier events, and by their willingness to continue both tacitly approved of that course of action."

As to Contreras, defendant's argument fails because the evidence, though sufficient to *permit* a finding she had the requisite intent to assist in the commission of the target crimes, did not compel that finding as a matter of law. As we have explained, an act that "has the effect of giving aid and encouragement" and "is done with knowledge of the criminal purpose of the person aided, *may* indicate that the actor intended to assist in fulfillment of the known criminal purpose," and *may* therefore serve as the basis for "an inference" regarding an alleged aider and abettor's intent. (*People v. Beeman* (1984) 35 Cal.3d 547, 559, italics added.) "However, . . . the act may be done with some other purpose [that] precludes criminal liability." (*Ibid*.) As relevant to defendant's claim, Contreras testified at trial as follows: (1) at no point during the night in question was it her purpose or intention to rob or to shoot anyone; (2) she thought defendant had invited her out that night to "just hang out" and "[g]et drunk or something," and she would not have entered the car had she known about the robbery plan; (3) she did not take part in the planning of the events of that night, was never told she would receive any part of what defendant and Willover might obtain by robbery, and did not have in her mind that she would share in the proceeds of any robbery; and (4) she did not drive away or leave when she had the

67

opportunity because she was afraid defendant, who lived with her at Frymire's house, would find her and shoot her if she did. On this record, it was for the trier of fact to decide whether Contreras had the intent necessary to establish that she was an accomplice. [12] (See *People v. Williams*, *supra*, 43 Cal.4th at p. 637 [evidence of acts assisting the crimes did not establish as a matter of law the requisite mental state]; *People v. Fauber* (1992) 2 Cal.4th 792, 834 [same]: *People v. Tewksbury* (1976) 15 Cal.3d 953, 960–961 [same].) The court therefore properly refused to instruct the jury she was an accomplice as a matter of law. (See *People v. Gordon* (1973) 10 Cal.3d 460, 467 ["where the facts are in dispute as to the knowledge and intent of the asserted accomplice, the witness'[s] liability for prosecution is a question of fact for the jury"].)

The question is much closer regarding Tegerdal. The People focus on Tegerdal's testimony at trial that he did not "have an intent to get out of the car and go up to [Aninger and Mathews] and rob them"; did not touch the gun at any time during that night; was surprised at the wharf when Willover started shooting; did not drive during commission of the crimes; and suggested switching cars after the first shooting, not to further defendant's shooting spree, but simply to avoid detection. However, Tegerdal also testified as follows: (1) before picking up Contreras, he knew the "basic purpose of that entire night was to go and rob somebody"; (2) defendant and Willover had told him "to go along with" the robbery plan "and be cool and [he] would get some of the money"; (3) he went along with the plan because he "hadn't had money for so long"; (4) after leaving the gas station and before going to the wharf, he participated in a conversation

---

[12] That Contreras, during her trial testimony, admitted telling police in a prior statement she *may* have known about the robbery plan when she got into the driver's seat and drove to Jacks Park does not compel a contrary conclusion. (Cf. *Valdez*, *supra*, 55 Cal.4th at p. 147 [conflict between trial testimony and prior statement to police created question of fact for jury as to whether witness was an accomplice].)

about finding someone to rob and "knew that that's what we were going to do"; (5) "[s]ometime during the day on Saturday, January 31st, before the shootings" at the wharf occurred, he knew the gun in the car "was going to be used to commit a robbery"; (6) after the group left Jacks Park, he "personally" was "looking for people who might be good targets for robbery"; (7) upon spotting Aninger and Mathews, he asked "if they had any bags or purses or something," because "if they didn't . . . , what would be the point to try to rob them"; (8) "there was an agreement between everybody in the car that [Aninger and Mathews] were likely targets for a robbery"; (9) he suggested the group switch to his other car to avoid detection by the police, went with the group to his house, got into his other car with defendant, Tegerdal, and Contreras, and, without being asked to do so, personally drove the group away; (10) "might have been driving" up and down the streets of Salinas "looking for someone to rob"; and (11) turned the driving over to defendant "[b]ecause [he] was getting tired of driving." This record furnishes little support for the People's assertion that, "although [Tegerdal] furnished transportation, he lacked the intent to aid in the commission of the crimes."

Ultimately, however, we need not decide this question because, even were we to agree with defendant, he would not be entitled to relief. Error of the kind he alleges is harmless if the record contains "sufficient corroborating evidence." (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*Valdez*, *supra*, 55 Cal.4th at pp. 147-148.) The record here contains ample corroborating evidence, including testimony from other witnesses that: (1) shortly after the Olivo shooting, defendant arrived at Frymire's house in Seaside, seemed "real antsy," kept looking out the window, and placed a gun in the trunk of

69

Frymire's car; (2) the gun defendant left in Frymire's car was the same type of gun police later recovered and, using ballistics tests, identified as the murder weapon; (3) the evening after the shooting, Frymire observed defendant, upon seeing a news report about the murders, smile and make a gesture indicating he was the responsible person; (4) early on the morning of February 1, 1998, Anthony McGuiness found defendant, Willover, Contreras, and Tegerdal together in his living room; (5) during a search of McGuinness's house a few days after the shootings, police found a box of .22-caliber bullets underneath the couch, in the area where defendant had sat on the morning of February 1, 1998; (6) police later recovered expended .22-caliber bullet casings from the crime scenes and from Tegerdal's Monte Carlo, an unexpended .22-caliber bullet from his Cougar, and a .22-caliber gun they later identified as the murder weapon; (7) the morning of February 2, 1998, Linda McGuiness found a torn, black, right-hand glove in the trash; and (8) police recovered a matching left-hand glove at Frymire's house, where defendant had been staying before the shootings. On this record, any error in the trial court's refusal to instruct the jury that Tegerdal was an accomplice as a matter of law was harmless.[13]

### J. Factor (b) Instructions on Prior Criminal Activity

Defendant asserts that, in its penalty phase factor (b) instructions on prior criminal activity, the trial court erred by: (1) instructing that his alleged prior possession of guns and knives necessarily involved the express or implied use of force or violence or the threat of force or violence; (2) failing to instruct on the elements necessary to find possession or to find that the knives were dirks or daggers; and (3) permitting the jury to find that mere possession, as opposed to use, of an object with the potential for violence was sufficient.

---

[13]    The same would be true regarding Contreras, even were defendant correct that she was an accomplice as a matter of law.

Defendant's arguments fail. Regarding the first alleged error, a court does not err by failing to submit to the jury the question of whether the defendant's acts involved the use, attempted use, or threat of force or violence. (*People v. Nakahara* (2003) 30 Cal.4th 705, 720.) Although the question of whether the acts *occurred* is a factual matter for the jury, the characterization of those acts as involving an express or implied use of force or violence, or the threat thereof, is a legal matter for the court to decide. (*Ibid.*; *People v. Burney* (2009) 47 Cal.4th 203, 259.) Regarding the second alleged error, "absent a request, a trial court has no duty to instruct on the elements of unadjudicated crimes admitted under factor (b). [Citations.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 654.) Here, defendant's counsel not only failed to request instructions regarding the elements of the unadjudicated crimes, he maintained that the court should use "a plain English description of what [defendant is] alleged to have done," "as opposed to Penal Code sections," and expressed doubt as to whether the court should instruct on what the prosecution "ha[d] to prove beyond a reasonable doubt" to establish those alleged crimes. Regarding the third alleged error, our law already recognizes that possession of a weapon "is not, in every circumstance, an act committed with actual or implied force or violence," and that "[t]he factual circumstances surrounding the possession" must "indicate an implied threat of violence. [Citation.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1127.) Here, the trial court did not abuse its discretion in finding that the circumstances surrounding the possessions involved a threat of violence. Defendant was on probation at the time he possessed these weapons. The guns, which were similar to the weapons defendant used to commit the crimes now at issue, were concealed beneath the seat directly in front of defendant, defendant had live ammunition in his pocket of the same caliber as the concealed weapons, and he admitted to his probation officer that he had purchased the weapons. The knives, which were found right next to where defendant was sitting, had fixed blades and were seven to nine inches in overall length. Tegerdal, who was with defendant when he

71

committed the crimes at issue here, was driving both cars in which the knives were found. This evidence was sufficient to warrant a finding of an implied threat of violence. (See *ibid*.; *People v. Michaels* (2002) 28 Cal.4th 486, 535-536; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1186-1187.)

In any event, any error regarding defendant's possession of these weapons was harmless. The jury heard testimony that defendant committed numerous other unadjudicated criminal acts, including beating the mother of his child severely enough to require medical attention; beating his sister to the point of unconsciousness and stomping on her head, leading an eyewitness to believe that defendant was trying to kill her; a few hours after administering the beating, going to look for his sister at the hospital, carrying a concealed sawed-off shotgun and live ammunition; after being detained and arrested by police, returning to the hospital and threatening the security guard who had reported him to police; beating Willover in June 1998 when they briefly occupied the same holding cell; participating in a prison riot, charging into a guard with enough force to split the guard's protective shield; and bragging in a letter to a friend about his role in the riot, stating that he liked to "get rowdy" with the guards. Given this evidence, no reasonable possibility exists that the evidence of defendant's prior weapons possession affected the verdict. (See *Lewis*, *supra*, 43 Cal.4th at p. 527.)

### K. Exclusion of Evidence Regarding Life Without the Possibility of Parole

Defendant asserts the trial court prejudicially erred in denying his motion to introduce at the penalty phase expert testimony "that would have addressed some of the common misperceptions about life without the possibility of parole." In his motion, defendant argued that, because "potential jurors do not believe that a sentence of life in prison without the possibility of parole means that a person will never be paroled," the court should allow him "to present expert testimony . . . explaining the source of the misconceptions concerning the penalty of life in prison without the possibility of parole." He stated that the expert would explain

72

that (1) "many convicted killers . . . were convicted under different laws than those which exist today," and (2) some California inmates sentenced to death had become eligible for parole because of the high court's decision in *Furman v. Georgia* (1972) 408 U.S. 238.  Defendant asserts on appeal that, in denying this motion, the trial court violated his constitutional right to present evidence in mitigation of a death sentence.

For two reasons, his claim fails.  First, we have previously rejected the view that the misperception defendant alleges commonly exists.  (See *People v. Wilson* (2005) 36 Cal.4th 309, 354; *People v. Sanders* (1995) 11 Cal.4th 475, 562; *People v. Bonin* (1988) 46 Cal.3d 659, 698.)  Second, as we have explained, the term, "confinement in the state prison for life without possibility of parole," which appeared here in a penalty phase instruction asking jurors to impose a sentence of "death or confinement in the state prison for life without possibility of parole," is commonly understood by those familiar with the English language, is not used in a technical sense peculiar to the law, and can readily be understood by jurors. (*People v. Ochoa* (1998) 19 Cal.4th 353, 457.)  Accordingly, the trial court did not abuse its discretion in excluding the proffered expert testimony directed at this alleged "misperception."[14]  (See *People v. Watson* (2008) 43 Cal.4th 652, 692 ["Expert opinion testimony is admissible only if it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' "].)

---

[14]    Defendant's opening brief at times appears to be suggesting that the trial court should have allowed him to introduce expert testimony regarding other alleged misconceptions about a life sentence and the prison conditions for life prisoners.  Insofar as he is making these arguments, we need not respond.  The record shows that, in his motion, he did not mention or proffer evidence regarding either issue.  Moreover, regarding the prison conditions for life prisoners, his reply brief clarifies that he is *not* making this argument.

**L. Other Issues**

Defendant makes numerous other challenges to his convictions. He acknowledges we have previously rejected similar claims, but asks us to reconsider our prior decisions. We reject his request.

The trial court did not err by failing to instruct the jurors during the guilt phase that they had to agree unanimously on whether the murder was premeditated and deliberate or felony murder. (*People v. Tully* (2102) 54 Cal.4th 952, 1023.)

The trial court did not err by giving during the guilt phase CALJIC Nos. 2.06 (attempts to suppress evidence), 2.51 (motive), and 2.52 (flight). (*People v. Friend*, *supra*, 47 Cal.4th at pp. 52-53; *People v. Jurado*, *supra*, 38 Cal.4th at pp. 125-126.)

The trial court did not err during the penalty phase by excluding evidence that, because Willover was only 17 years old when he committed the crimes, he was sentenced upon conviction to life without the possibility of parole rather than death. (*People v. Moore* (2011) 51 Cal.4th 1104, 1141-1142.)

California's death penalty statute (§ 190.2) "is not impermissibly broad and adequately narrows the class of death-eligible defendants. [Citation.]" (*People v. Brady* (2010) 50 Cal.4th 547, 590 (*Brady*).)

The lack of intercase proportionality review in capital cases is not unconstitutional. (*Valdez*, *supra*, 55 Cal.4th at p. 180.)

The penalty phase instructions on, and the application of, section 190.3, factor (a), do not allow for the arbitrary and capricious imposition of the death penalty. (*Brady*, *supra*, 50 Cal.4th at p. 590.)

In the penalty phase, the trial court need not instruct jurors that (1) they may not consider acts of prior unadjudicated criminality as an aggravating circumstance unless they unanimously find that defendant committed those criminal acts; (2) certain sentencing factors are only relevant as mitigating; (3) the prosecution has the burden of proving beyond a reasonable doubt that aggravating circumstances exist, that they outweigh the mitigating factors, and that they are so

substantial as to make death the appropriate punishment; (4) they must find beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and are so substantial as to make death the appropriate penalty; (5) their findings on aggravating circumstances must be unanimous; (6) the prosecution has the burden of persuasion regarding the ultimate penalty phase determinations the jury must make; (7) there is a presumption favoring life imprisonment; and (8) they should impose life imprisonment without the possibility of parole if they find that the mitigating circumstances outweigh the aggravating circumstances. (*Valdez*, *supra*, 55 Cal.4th at p. 179; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1366 (*McKinzie*); *Zamudio*, *supra*, 43 Cal.4th at p. 373.)

The trial court need not delete factually inapplicable sentencing factors from the penalty phase instructions. (*Valdez*, *supra*, 55 Cal.4th at p. 180.)

Including in the penalty phase instruction's list of potential mitigating factors adjectives such as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (*id.* factor (g)) does not erect an impermissible barrier to the jury's consideration of mitigating evidence. (*Valdez*, *supra*, 55 Cal.4th at p. 180.)

During the penalty phase, jurors need not make written findings regarding aggravating factors or in determining penalty. (*Valdez*, *supra*, 55 Cal.4th at p. 180; *McKinzie*, *supra*, 54 Cal.4th at p. 1364.)

The penalty phase instructions were not impermissibly broad or vague in directing jurors to determine whether the aggravating factors were " ' "so substantial in comparison with the mitigating factors that it warrants death instead of life without parole." ' " (*Valdez*, *supra*, 55 Cal.4th at p. 180.)

CALJIC No. 8.88 does not misstate the law by asking jurors whether the circumstances "warrant[ ]" death, rather than whether death is the "appropriate" punishment. (*People v. Duenas* (2012) 55 Cal.4th 1, 27.)

International law does not bar imposing a death sentence rendered in accord with state and federal constitutional and statutory requirements. (*Valdez*, *supra*, 55 Cal.4th at p. 180.)

The death penalty is not inherently cruel or unusual punishment.  (*People v. Booker* (2011) 51 Cal.4th 141, 195.)

### M.  Cumulative Error

Defendant contends the errors he alleges cumulatively amounted to reversible error.  To the extent there are a few instances in which we have found error or assumed its existence, no prejudice resulted.  We reach the same conclusion after considering their cumulative effect.

## III. DISPOSITION

The judgment is affirmed.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
BAXTER, J.
CORRIGAN, J.

**CONCURRING AND DISSENTING OPINION BY WERDEGAR, J.**

Defendant was driving a car when, with his knowledge and encouragement, one of the passengers, codefendant Norman Willover, leaned out the passenger side window and sprayed victims Jennifer Aninger and Priya Mathews with bullets, resulting in Mathews's death and severe and permanent injuries to Aninger. I concur in the majority's opinion affirming defendant's convictions of the murder of Mathews and the attempted murder of Aninger. I dissent from that part of the opinion that affirms defendant's conviction of aggravated mayhem as to Aninger. As I explain, no substantial evidence supports the conclusion that Willover, as required for the offense of aggravated mayhem, acted with the *specific intent* to inflict on Aninger a permanently disabling or disfiguring injury; likewise, no substantial evidence supports the conclusion that defendant, whose culpability as the nonshooter is premised on his status as Willover's aider and abettor, specifically intended that Willover inflict a permanently disabling or disfiguring injury on the victim. Because reversal of this one count would not undermine the legitimacy of the other convictions or the imposition of the death penalty, I otherwise concur.

I.

The strength of evidence supporting a criminal charge undergoes three different assessments during legal proceedings, all for the protection of the accused. The evidence is weighed preliminarily by the committing magistrate or,

less commonly, by a grand jury if the People proceed by way of an indictment. The critical assessment is then made at trial, usually by a jury unless waived. The jury weighs the evidence, resolves conflicts therein, and evaluates the credibility of witnesses. After the verdict, a defendant may seek further review by filing a motion for a new trial. Thus, by the time the case reaches an appellate court, the strength of the evidence has, in the normal case, been fully evaluated. The majority therefore accurately sets forth the deferential standard of review when an appellate court is confronted with a claim of insufficient evidence. But contrary to the majority's view, the sufficiency of the evidence is *not* merely one for the jury. (Maj. opn., *ante*, at p. 65.) In this case, even applying a deferential standard of review, and viewing the whole record in a light favorable to the judgment and presuming the existence of all facts reasonably deducible from that record, I find an absence of " ' "evidence that is reasonable, credible, and of solid value . . . from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" ' " of aggravated mayhem. (*People v. Jones* (2013) 57 Cal.4th 899, 960, citing *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.) I reach this conclusion because, although the People presented ample evidence that defendant and codefendant Willover acted with a specific intent to kill Aninger, no evidence was presented that they intended to maim her, as that offense is defined in Penal Code section 205. (All further statutory references are to the Penal Code.)

Section 205 states in pertinent part: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, *intentionally* causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For

2

purposes of this section, it is not necessary to prove an intent to kill." (Italics added.) In contrast to the crime of simple mayhem in section 203,[1] which is a general intent crime (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1226; see *People v. Sears* (1965) 62 Cal.2d 737, 745), "the unambiguous language of section 205 compels the conclusion that the specific intent to cause the maiming injury is an element of aggravated mayhem" (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 833; see *People v. Assad* (2010) 189 Cal.App.4th 187, 195 ["Aggravated mayhem requires the specific intent to cause the maiming injury."]). I do not read the majority opinion to say otherwise, and consider the issue of the intent requirement for aggravated mayhem to be one of settled law. (See 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 90, pp. 878-879 [aggravated mayhem requires specific intent to inflict a maiming injury].)

Although I agree Aninger's injuries are sufficient to qualify as permanently disabling or disfiguring, that such maiming injuries resulted from the attack is not itself sufficient evidence to prove that Willover (and hence, defendant) *specifically intended* to inflict injuries of that type. (*People v. Assad*, *supra*, 189 Cal.App.4th at p. 195; *People v. Park* (2003) 112 Cal.App.4th 61, 64.) Although a controlled and direct attack, or one of focused or limited scope, may be sufficient to demonstrate the specific intent to inflict a maiming injury,[2] it is well established

---

[1]     Section 203 provides: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

[2]     See *People v. Santana* (2013) 56 Cal.4th 999 [three focused gunshots from close range into the victim's leg and buttocks sufficient to prove intent to inflict a maiming injury]; *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162 (intentionally inflicting deep cuts to victim's face sufficient to show specific intent to maim); *People v. Park*, *supra*, 112 Cal.App.4th 61, 65 (bludgeoning victim's

*(footnote continued on next page)*

that an indiscriminate attack or explosion of violence is insufficient to prove the specific intent to inflict a permanently disabling or disfiguring injury.

This court addressed the issue almost 50 years ago in two cases involving felony murder based on the crime of simple mayhem.  In *People v. Sears*, *supra*, 62 Cal.2d 737,[3] the defendant was charged with first degree murder on a felony-murder theory based on the commission of mayhem.  As this court explained, although the crime of simple mayhem is a general intent crime, reliance on that felony to elevate a killing to first degree murder required proof the defendant had specifically intended to inflict a maiming injury.  (*Id*., at p. 744.)  Turning then to the facts of that case, this court observed that "the evidence discloses that defendant struck [the victim] several times with a steel pipe; one of the blows resulted in a laceration of the lip; another, a laceration of the nose.  *But such evidence does no more than indicate an indiscriminate attack; it does not support the premise that defendant specifically intended to maim his victim*.  In the absence of such a showing of specific intent to commit mayhem, the court should not give the jury an instruction on felony murder mayhem."  (*Id*., at p. 745, italics added.)

We followed *Sears*'s holding later that same year in *People v. Anderson* (1965) 63 Cal.2d 351.  In that case, evidence demonstrated the defendant inflicted

---

*(footnote continued from previous page)*

head and mouth with a steel knife sharpener, stopping once the victim had lost several teeth, sufficient to show specific intent to disfigure); *People v. Campbell* (1987) 193 Cal.App.3d 1653 (striking victim with a screwdriver and brick on the face and head, stopping once her ear was partially severed, sufficient to indicate specific intent to inflict a maiming injury).

[3]     *People v. Sears* was overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, footnote 17.

4

over 60 stab wounds on the body of the victim, the 10-year-old daughter of his cohabitant. Forty-one of the wounds were significant, including lacerations of the lung that the autopsy report cited as the cause of death. (*Id.*, at p. 356.) The prosecution suggested the defendant, drunk and sexually aroused, tried to molest the victim and, when rebuffed, killed her to silence her. (*Id.*, at p. 357.) Defendant was convicted of first degree murder on four theories, one of which was murder in the perpetration of mayhem. (*Id.*, at p. 357.)

Speaking to whether evidence of this theory was sufficient to justify appropriate jury instructions, this court found the trial court erred by instructing the jury on felony murder mayhem because "no substantial evidence supports a finding that defendant specifically intended to commit mayhem." (*People v. Anderson*, *supra*, 63 Cal.2d at p. 358.) "To establish a felony-murder, the prosecution must prove that the defendant specifically intended to commit the felony. [Citations.] Yet the record here does not disclose substantial evidence showing a specific intent to commit mayhem. *The evidence does no more than indicate an indiscriminate attack*; it cannot independently uphold a verdict based on the precise premise that defendant entertained the specific intent to commit mayhem. Thus, as we said in *People* v. *Sears, supra,* [62 Cal.2d] at p[age] 745, 'In the absence of such a showing of specific intent to commit mayhem, the court should not give the jury an instruction on felony murder mayhem.' " (*Id.*, at pp. 358-359, italics added.)

More recent cases have cited *Anderson* and *Sears* with approval. (*People v. Assad*, *supra*, 189 Cal.App.4th at p. 195; *People v. Lee* (1990) 220 Cal.App.3d 320, 325; *People v. Ferrell*, *supra*, 218 Cal.App.3d at p. 835; see also *People v. Gonzales* (2011) 51 Cal.4th 894, 941 [recognizing the rule in the context of felony murder mayhem]; *People v. Kelly* (1990) 51 Cal.3d 931, 957 [acknowledging the rule]; *People v. Park*, *supra*, 112 Cal.App.4th at p. 64 [same].)

5

The majority rejects the applicability of this established authority, and instead posits several possible alternative scenarios to suggest Willover and defendant may have acted with the specific intent to inflict a permanently disabling or disfiguring injury on Aninger:  that this was a targeted attack, that Willover aimed at a specific body part from close range, that Willover and defendant desired to eliminate any witnesses, and that they shot the victims for their own sadistic pleasure.  These theories are of questionable validity.  That Willover (and hence defendant) "targeted" Aninger is a given, in that the jury found he intended to kill her, but such targeting does not raise an inference that he also specifically intended to maim her.  Similarly, that he desired to eliminate witnesses supports an inference that he intended to kill but says nothing about whether he acted with an intent to maim.  Certainly that Willover and defendant shot Aninger for sadistic pleasure does not logically raise an inference that they intended *to maim*.  In essence, what the majority opinion comes down to is that the fact Aninger was shot once in the face and once in her upper arm, which is near her face, of itself "can support an inference of an intent to cause permanent disability or disfigurement."  (Maj. opn., *ante*, at p. 59.)  I disagree.

The mental component, or mens rea, of the crime of aggravated mayhem is the specific intent to inflict a permanent disabling or disfiguring injury on the victim.  That is, it is the intent to inflict a grievous injury *but allow the victim to live*.  The history of the law illustrates this point.  "First codified in 1850, the crime of mayhem originated in the English common law.  [Citations.]  The early common law crime of mayhem prohibited a person from dismembering or disabling another person, causing 'an injury which substantially reduced the victim's formidability in combat.'  [Citations.]  Though not displacing the common law definition, England's Coventry Act, enacted in 1670, later expanded the crime of mayhem to include 'mere disfigurement without an attendant

6

reduction in fighting ability,' if the injury was intentionally inflicted." (*People v. Santana*, supra, 56 Cal.4th at p. 1003.) Although the crime of simple mayhem in section 203 "contains 'verbal vestiges' of the common law and the Coventry Act of 1670, ' "the modern rationale of the crime may be said to be the preservation of the natural completeness and normal appearance of the human face and body, and not, as originally, the preservation of the sovereign's right to the effective military assistance of his subjects." ' [Citations.] In other words, section 203 'protects the integrity of the victim's person.' " (*Santana*, *supra*, at p. 1004.)

This history of the common law crime of mayhem (which is codified in § 203) provides content for the required mental element applicable to the statutory crime of aggravated mayhem (§ 205). Sections 203 and 205 are in pari materia and thus should be read together; indeed, both address the crime of mayhem, an older form of the word "maim" (*People v. Keenan* (1991) 227 Cal.App.3d 26, 33), which means "to disable, wound, cause bodily hurt or disfigurement to. Subsequently: to deprive of (the use of) a limb, etc.; to mutilate; to cripple." (Oxford English Dict. Online (2013) <http://www.oed.com> as of Dec. 2, 2013.) Because the list of maiming injuries in section 203 ("cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip") all describe an injury *short of death*, the phrase "permanent disability or disfigurement," as used in section 205, should be read in that light. That section 205 expressly disclaims the necessity for proving intent to kill is telling, for the key distinguishing feature of mayhem versus homicide is the assailant's intention that his victim should *not* die of the injuries, but should live with the emotional and physical pain of disability or disfigurement. Thus, despite the prosecutor's argument to the jury in this case[4]

---

[4] He argued: "If you repeatedly shoot a pistol into another person's body at close range, specific intent to commit the crime of aggravated mayhem has been

*(footnote continued on next page)*

7

and the majority's stated analysis,[5] an intent to kill may not, absent unusual facts not present here,[6] logically substitute for an intent to maim, because intending to kill someone presupposes an intention that the victim will die and thus will *not* survive the attack and suffer living with the ensuing disability or disfigurement.

In short, the majority points to no evidence that is " ' "reasonable, credible, and of solid value" ' " (*People v. Jones*, *supra*, 57 Cal.4th at p. 960) from which the jury could have found beyond a reasonable doubt that when Willover shot Aninger, he and defendant entertained the contradictory objectives that Aninger should die and that she also should live while suffering a permanently disabling or disfiguring injury.

My concern is that the majority's analysis will inject confusion into the law where none before existed. If, as the majority reasons, the same fact that can

---

*(footnote continued from previous page)*

proved. If the person dies, you are guilty of murder. If the person manages to live . . . you are guilty of aggravated mayhem."

[5]     The majority reasons: "In prior decisions, we have held that the fact the victim was shot in the head can support an inference of an intent to kill. [Citations.] We now find that the same fact can support an inference of an intent to cause permanent disability or disfigurement." (Maj. opn., *ante*, at p. 59.)

[6]     Although unusual, a person can simultaneously entertain logically contradictory mental states. For example, in *People v. D'Arcy* (2010) 48 Cal.4th 257, the defendant killed the victim by dousing her with gasoline and lighting her on fire. We upheld the defendant's conviction for first degree murder on a felony murder mayhem theory, noting that "the evidence showed that [the] defendant had concurrent intents to maim and murder [the victim]." (*Id*., at p. 297.) That evidence showed the defendant told a witness: "I'm not going to kill her. I just want to [light her on fire]." (*Ibid*.) But he later told the same witness that he was "going to kill" the victim. (*Ibid*.) On the state of the evidence in *D'Arcy*, it was for the jury to decide whether the defendant held one, the other, or both intents when he committed the crime. No such evidence is present in this case.

8

support an intent to kill—i.e., that the victim was shot in the head—"can support an inference of an intent to cause permanent disability or disfigurement" (maj. opn., *ante*, at p. 59), many cases of attempted murder will, as a logical matter, also involve aggravated mayhem, raising the question of whether the trial court is obligated to deliver jury instructions on the other crime. Further, future cases involving a planned and deliberate, albeit indiscriminate, attack on a victim can now be elevated to one of aggravated mayhem, despite the clear line of authority dating back to *People v. Sears*, *supra*, 62 Cal.2d 737, and *People v. Anderson*, *supra*, 63 Cal.2d 351, that such attacks lack the intent required to prove that crime.

## II.

I thus dissent from the majority's decision to affirm defendant's conviction for aggravated mayhem. I concur in the majority opinion in all other respects, including the decision to affirm the penalty judgment, as it is not reasonably possible the jury would have returned a more favorable penalty verdict in the absence of the error. (*People v. Kraft* (2000) 23 Cal.4th 978, 1060; *People v. Brown* (1988) 46 Cal.3d 432, 448 ["when faced with penalty phase error not amounting to a federal constitutional violation, we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred"].)


**WERDEGAR, J.**


**I CONCUR:**

**LIU, J.**


9

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

I write separately to address defendant's claim that the prosecutor used a peremptory strike against Prospective Juror No. 20 in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258. I agree that the claim must be denied, but because the trial court's ruling was unaccompanied by any findings or analysis, I would not accord deference to the ruling in affirming it. (See *People v. Mai* (2013) 57 Cal.4th 986, 1060-1061 (conc. opn. of Liu, J.); *People v. Williams* (2013) 56 Cal.4th 630, 715 (dis. opn. of Liu, J.).)

Prospective Juror No. 20, a 44-year-old African-American woman, was called to the jury box in the first group of 18 prospective jurors, and she was the first juror peremptorily struck by the prosecutor. Defendant objected, and the trial court asked the prosecutor to explain the challenge, thus impliedly finding a prima facie case of purposeful racial discrimination. (*People v. Lewis* (2008) 43 Cal.4th 415, 470.) The prosecutor responded as follows: "She stated quite clearly on her jury questionnaire that she was opposed to the death penalty. She checked the box that says oppose. She stated in her narrative answer, I oppose the death penalty because I believe many innocent people have been put to death wrongfully. And in answer to the court's follow-up question, she said possibly she could vote for the death penalty. She added that life is a more severe punishment. She sat on a previous jury in a different murder case and it was a hung jury. This was some 15

1

years ago. I have an absolute policy of getting rid of people whose only jury experience resulted in a hung jury." Defense counsel argued that the prospective juror had served not on a hung jury, but on a jury that had failed to complete deliberations because several jurors had become ill. The trial court denied the *Batson* motion without any findings or analysis, stating only: "It's a proper use of a peremptory challenge."

This record satisfies my colleagues that the trial court fulfilled "its duty to make a sincere, meaningful and reasoned evaluation" of the prosecutor's proffered justifications and did not "simply accept[] the . . . justifications 'at face value.' " (Maj. opn., *ante*, at p. 44.) But the trial court's unexplained ruling leaves us in the dark as to what evaluation the trial court actually made. To conclude that deference is unwarranted is not to conclude that the trial court's ruling was wrong or that the trial court did not actually evaluate the reasons given for a strike. It is to conclude that an appellate court, when faced with an unexplained ruling, does not know what went into the trial court's judgment and thus has nothing to which it can defer. (See *United States v. Rutledge* (7th Cir. 2011) 648 F.3d 555, 559 ["if there is nothing in the record reflecting the trial court's decision, then there is nothing to which we can defer"].) Filling the gap with presumptions, as the court routinely does, falls short of the careful inquiry required by high court precedent (see *Snyder v. Louisiana* (2008) 552 U.S. 472; *Miller-El v. Dretke* (2005) 545 U.S. 231) and all but "dispense[s] with appellate review in such cases since it is so easy to rationalize a silent record with a cacophony of presumptions" (*People v. Mai*, *supra*, 57 Cal.4th at p. 1062 (conc. opn. of Liu, J.)).

In the present case, I would affirm the trial court's *Batson* ruling based on an independent review of the record. The prosecutor's reliance on Prospective Juror No. 20's death penalty views is firmly substantiated by the record. The juror checked the box on her questionnaire indicating she opposed the death penalty;

2

she expressed the view that life in prison was worse than death; and she said innocent people had been wrongly put to death. In light of these facts, defendant has not shown it is more likely than not that the prosecutor's concern was pretextual. Ultimately, no seated juror expressed similar views on the juror questionnaire or during voir dire.

I would hesitate, however, to rely on the prosecutor's assertion that "I have an absolute policy of getting rid of people whose only jury experience resulted in a hung jury." It is hard to know what to make of such an unqualified and single-minded statement before the prosecutor had a chance to strike or accept other jurors who might have fit the description. Without some indication from the trial court as to why such a sweeping statement appeared credible, I would not put much weight on the mere assertion itself.

The record in this case bears out the potential hazard of crediting such an assertion. Two seated jurors' sole experience on a jury had resulted in a hung jury. Juror No. 196 had served on a jury in a drunk driving case that resulted in a hung jury, yet the prosecutor accepted the jury as constituted four times after Juror No. 196 was seated. Juror No. 28 had served on a jury in a civil case regarding a contract dispute that resulted in a hung jury, yet the prosecutor accepted the jury as constituted seven times after Juror No. 28 was called. A third seated juror, No. 94, had served on two previous juries, one of which had resulted in a hung jury, yet the prosecutor accepted the jury as constituted seven times after Juror No. 94 was seated. The prosecutor's "absolute policy," it turns out, was not absolute at all.

My point is not that the trial court should have had the clairvoyance to know, at the time the *Batson* motion was made, that the prosecutor's stated reason would later turn out to be false. Rather, I mention what happened in this case as a cautionary tale with respect to crediting broad assertions of "absolute policy" in the nuanced and individualized process of exercising peremptory strikes. Inquiry

3

by a trial court, as opposed to an unexplained ruling, may help elicit relevant elaboration, qualifications, or assurances that permit a reasoned judicial evaluation of the credibility of such assertions as a basis for a peremptory strike.

In addition to the reservations above, I agree with Justice Werdegar that the evidence was insufficient to convict defendant of aggravated mayhem. In all other respects, I join the court's opinion.

LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Manibusan
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S094890
**Date Filed:** December 2, 2013
_____

**Court:** Superior
**County:** Monterey
**Judge:** Jonathan R. Price

_____

**Counsel:**

David S. Adams, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Alice B. Lustre and Alisha M. Carlile, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David S. Adams
P.O. Box 1670
Hood River, OR  97031
(541) 221-8748

Alisha M. Carlile
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5205